THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JOHN GREGORY ARDITO, Defendant-Appellant.

First Department, April 15, 1982

**APPEARANCES OF COUNSEL**

*Arnold D. Roseman* and *Peter J. Peluso* for defendant-appellant.

*Steven R. Kartagener* of counsel (*Alan D. Marrus* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

**OPINION OF THE COURT**

CARRO, J.

We are substantially in agreement with the statement of the facts set forth by Justice BLOOM in his dissent, as we are with his conclusions on matters other than whether a prima facie case of a conspiracy to commit criminal usury was established. We find that the prosecution never established, prima facie, the existence of that conspiracy without recourse to the challenged statements. Therefore, the

out-of-court declarations of Tutino, the alleged coconspirator and accomplice, to the witness Sanchez, made out of the presence of appellant, were never rendered admissible against appellant, and their receipt was error. Further, without these declarations, the prosecution must fail and the indictment should be dismissed. It is also not necessary to consider whether the record discloses evidence sufficient to corroborate those declarations, since, as they were not admissible, there remained nothing to corroborate.

Appellant Ardito and his original codefendants, Tutino and Salzarulo, were charged in a two-count indictment with acting in concert to commit the crimes of criminal usury in the first degree and grand larceny in the first degree. The indictment contained no conspiracy count. Subsequent to the selection of the jury in Ardito's trial, the People made an offer of proof for the purpose of establishing that a prima facie case existed of a conspiracy between Ardito and Tutino, through the direct testimony of Sanchez. Thus the court would permit hearsay evidence of the declarations of the alleged coconspirator, Tutino, as being made in furtherance of the supposedly established conspiracy.

The Assistant District Attorney advised the court that the People would call one Richard Sanchez to the stand, and he would testify that Tutino took him to see Ardito and they participated in a three-way conversation in which Ardito agreed to lend him money at a usurious rate of interest.

"THE COURT: Will Mr. Sanchez at that point testify that Mr. Ardito participated in that conversation?

"MR. IACOVETTA: And he will also say —

"THE COURT: Yes or no

"MR. IACOVETTA: Yes, he will. And he will also say that unequivocally at that first conversation, Mr. Ardito, in the presence of Sanchez and Tutino, acknowledged that the money which was changing hands * * * Mr. Sanchez will state unequivocally the understanding was that this was Mr. Ardito's money that Mr. Sanchez was receiving and that he would have to pay the interest to Mr. Tutino every week * * *

"MR. IACOVETTA: * * * it is obvious that Mr. Sanchez' own testimony is going to be there. Other than that, there is really no testimony in this case.

"THE COURT: Other than Sanchez?

"MR. IACOVETTA: No corroboration or confirmation that Mr. Ardito did, in fact, get money or receive money."

In his opening statement the prosecutor told the jury that, when Sanchez was introduced to Ardito by Tutino, he borrowed a sum of money from Ardito and a usurious rate of interest was agreed upon between Ardito, Tutino and Sanchez. He then emphasized: "Mr. Sanchez will tell you from his own mouth that he borrowed this money from Mr. Ardito and Mr. Tutino acting together, that he paid them interest at two percent a week for a total of one hundred and four percent a year."

The People's first witness was Richard Sanchez. He testified about meeting Ardito for the first time aboard Ardito's boat in the company of Tutino.

"Q. Whose idea was it to go to that particular boat?

"A. Mr. Tutino * * *

"Q. Before having that conversation with Mr. Tutino, had you ever been on that boat before?

"A. No.

"Q. Had you ever met Mr. Ardito before?

"A. No * * *

"Q. How long did you stay on that boat?

"A. Three minutes.

"Q. During those three minutes what happened, what did you do, if anything?

"A. I received money from Mr. Tutino * * *

"Q. And who was present when Mr. Tutino gave you that money?

"A. Mr. Tutino and myself * * *

"Q. After that he introduced you to Mr. Ardito?

"A. He happened to come up.

"Q. Was Mr. Ardito present at any time when Mr. Tutino was talking to you about the amount of money or interest on the money or the fact this was Buster's money?

"A. No."

Counsel for the defendant objected several times and moved for mistrial. The application was denied. Thus the testimony of the People's only witness had failed to meet their expectations and had brought their case down with those expectations. As the prosecutor himself had predicted, "Other than that [Sanchez' testimony], there is really no testimony in this case * * * No corroboration or confirmation that Mr. Ardito did, in fact, get [give?] money or receive money". As it became clear that the People would not be able to make out a prima facie case of conspiracy, it became also clear that there was insufficient evidence, independent of Tutino's declarations to Sanchez, to support the charge that Ardito loaned Sanchez money at a usurious rate of interest and that this was part of a scheme and business of making and collecting usurious loans.

A declaration by a coconspirator during the course of and in furtherance of the conspiracy is admissible against another coconspirator, as an exception to the hearsay rule (*People v Rastelli,* 37 NY2d 240, 244), and it is not necessary, in order to make such proof competent, that the conspiracy be charged in the indictment (*People v Luciano,* 277 NY 348, 358). However, this evidence may be admitted only upon a showing that a prima facie case of conspiracy has been established (*People v Salko,* 47 NY2d 230, 237; *People v Rastelli, supra*). "Of course, the determination whether a prima facie case of conspiracy has been established must be made without recourse to the declarations sought to be introduced" (*People v Salko, supra,* at p 238).

Without Tutino's declarations to Sanchez, the People in their attempt to prove appellant's guilt of the substantive crime of criminal usury in the first degree have only Sanchez' testimony that he borrowed money from and made payments to Tutino, the tapes of Ardito's conversations with Tutino, and Ardito's four "fortuitous" appearances. The taped conversations are vague (perhaps deliberately so) and suspicious. But mere vagueness and suspicion

do not rise to the level of evidence, and these conversations do not rise to the level of the proof required to permit the submission of these questions to a jury. They are not aided in this endeavor by those four appearances by appellant at about the time of Sanchez' meetings with others in his attempts to obtain funds. In no way do they supply evidence of Ardito's participation in a usurious loan or in a scheme or business of making such loans. Had Sanchez testified, as hoped, that Ardito had passed him the money on the boat or at least had been present at the time, a case would have been made out. But Ardito was never present when words were uttered or actions taken signifying culpability.

The judgment of the Supreme Court, Bronx County (GOLDFLUSS, J.), rendered on October 1, 1980, convicting defendant-appellant upon a jury verdict of criminal usury in the first degree and sentencing him to a term of 5 to 15 years, should be reversed, on the law, and the indictment should be dismissed.

BLOOM, J. (dissenting). Analysis of the issues on this appeal from a conviction for criminal usury in the first degree reduces them to four questions: first, whether the prosecution established prima facie, the existence of a conspiracy to commit criminal usury so as to render admissible against his coconspirator, James Gregory Ardito (Buster), the statements made by Ralph Tutino (the General) during the course of the conspiracy; second, whether the record discloses evidence sufficient to corroborate the General's testimony; third, whether the court-ordered electronic monitoring of the telephone conversations between Tutino and Buster Ardito violated section 2516 of title 18 of the United States Code which sets forth Federal standards governing the investigation of crimes by means of electronic eavesdropping, which are binding upon the States; and, finally, whether the jury verdicts convicting defendant Ardito of criminal usury in the first degree and acquitting him of grand larceny in the first degree were repugnant. We answer the first two questions in the affirmative and the third and fourth in the negative. Accordingly, we would affirm the judgment convicting defendant of criminal usury in the first degree.

I

Richard Sanchez (the Swindler) first met Tutino — the General — during the early part of 1977. At that time Sanchez was negotiating for the purchase of Lockwood Manor, an adult home located in Westchester. What brought them together was the Swindler's need for money to consummate the purchase.

The two met at the office of Ray's Chris Craft, a boatyard on City Island owned by one Frank Starace, in February, 1977. Apparently agreement was reached at that meeting, for the following day Tutino lent the Swindler $50,000 at a "vig"[1] of 1% to 2% per week. The loan, far from ending Sanchez' financial problems, merely augmented them. Title to Lockwood Manor was taken by CCN Corporation, the Swindler's closely held corporation, in April, 1977. In taking title the corporation assumed a first mortgage in the sum of $2,845,000 held by Flushing Savings Bank (Flushing or the bank). The Swindler then proceeded to take out a second mortgage from the "Money Store" in the amount of $275,000. Additionally, he became indebted to the tune of $250,000 for equipment and supplies.

The normal monthly mortgage payment to Flushing was $28,000. Augmented by tax arrearages these monthly payments ran as high, on occasion, as $47,000. Inevitably, the payments, plus the need for payment of some portion of the other debts contracted by Lockwood Manor, caused serious cash flow problems. To Sanchez, the General was a port athwart seas which, financially, were uncomfortably stormy. Between February, 1977 and September, 1979, a period of 31 or 32 months, the Swindler borrowed approximately $500,000 from Tutino. During the same period he paid him approximately $1,000,000 in "vig", in addition to any sums which may have been paid in reduction of principal. "Vig" payments which, initially were comparatively small, mounted as high as $5,000 per week.

Although the General was the fountain which gushed forth the money lent to the Swindler, Tutino made clear that he was not the source of the funds. When Sanchez made his weekly "vig" payments Tutino would provide him

---

1. A term used by loansharks to indicate the rate of interest.

with an oral itemized statement of the source of the loans and the persons to whom the "vig" payments, and the amounts thereof, would be transmitted. Beginning in June or July, 1978 the General indicated that Buster Ardito, the defendant in this case, was the source of some of the loans made to the Swindler. Indeed, from June of 1978 through September of 1979 the Swindler borrowed approximately $250,000 from the General. Buster was identified by the General as the source of $50,000 of that sum.

The Swindler met Buster Ardito for the first time in June or July of 1978. An emergency arose necessitating a substantial borrowing by the Swindler. He called the General and was told to meet him at the boatyard at 1 o'clock. When he arrived at the boatyard office he was informed that the General was on Buster's boat. The Swindler boarded the boat where he met the General on deck. The General gave him an envelope containing $10,000. No one else was on deck at the time. When the envelope was delivered the General told the Swindler that the money was Buster Ardito's and was to be repaid within six months. Seconds thereafter Buster, who had been below, appeared on deck and was introduced to the Swindler by the General.

In September, 1978 the Swindler defaulted on Flushing's mortgage and foreclosure proceedings were instituted by the bank. The Swindler approached the General and told him that he was being consumed by the "vig" payments he was compelled to make on these usurious loans. He added that what he needed was a large, legitimate loan which would enable him to pay the mortgage arrears due to Flushing and, in addition, enable him to pay off the "vig" and principal due on the usurious loans. The General promised to see if he could find such a lender.

Shortly thereafter a meeting took place at the Swindler's office at Lockwood Manor, at which were present Sanchez, his attorney, the General, Buster and one Louis Evangelista who was introduced to the Swindler as a builder-developer of real estate in Connecticut and Manhattan. After review of the Swindler's financial position Buster informed him that he was not interested in making the loan sought. However, Evangelista evinced interest. He

suggested that Sanchez meet with him at his office in Long Island City the following week at which time the Swindler could present a more comprehensive review of his financial position.

Pursuant to the invitation, Sanchez and his attorney repaired to Evangelista's office the week following. As they arrived they saw Evangelista and Ardito standing outside the door to the office. Buster again introduced the Swindler to Evangelista and departed. The Swindler and his attorney then entered and the meeting commenced. Three possible alternatives were suggested by Sanchez; first, a "legitimate" loan of $300,000 which would enable him to pay off the General and pay the arrears on the mortgage to Flushing; secondly, an outright sale of Lockwood Manor to Evangelista; and finally a sale of the land and building with the Swindler continuing to operate the home. Evangelista indicated that he did not find the "legitimate" loan financially feasible. No discussion was had of the other two suggestions.

In the interim the Swindler's financial picture darkened. The bank proceeded with the foreclosure. Indeed, so black did the picture become that at one of the regular weekly meetings with the General, Sanchez told Tutino that he was unable to pay the "vig". The General compelled him to turn over his new Cadillac in lieu of such payment.

To add to the Swindler's woes, he was indicted by the Westchester Grand Jury for Medicaid fraud. In February, 1978, he pleaded guilty to a felony involving the submission of false costs totaling $59,000 for which he was reimbursed by the State.

Shortly thereafter the Bronx authorities learned of the Swindler's plight. These authorities were then investigating loan sharking in The Bronx. They approached Sanchez to ascertain if he would co-operate in the investigation. Ultimately agreement was reached, apparently with the consent of the Westchester authorities since a written agreement provided that if he co-operated fully his felony conviction would be vacated and a misdemeanor conviction substituted.

## II

With the Swindler's agreement to co-operate, the Bronx investigation was pursued vigorously. On the basis of information supplied by him and by his business associate, wiretap orders were obtained. Telephone conversations in which he participated were monitored with his consent and he agreed to wear a body tape at future meetings with the General, Buster and Evangelista.

Things now began to move with rapidity. Beginning with July 19, 1979 and continuing on July 23 there were recorded conversations between the General and the Swindler discussing arrangements for a second meeting of Sanchez with the "builder-developer", Evangelista. The recorded conversations between Ardito and Tutino, had on July 20 and July 24, indicate an interest in the outcome of the meeting far greater than that of a passive bystander. Indeed, it dealt, in part, with the offer to be made by Evangelista and speculation as to whether the bank would approve it. On July 25 the two spoke again. Part of their recorded conversation again dealt with the Swindler-Evangelista meeting which was to take place at 6:00 P.M. that evening. Indeed, although no mention was made of names it was quite clear that they knew of the others who were to be present. Again, it is apparent that they were aware of the offer to be made by Evangelista that evening; for the transcript of the conversation records the following:

"X [Buster] * * * they gotta convince the bank, they gotta convince the bank to go along with em.

"T [General] Of course

"X You understand what I mean?

"T Yeah.

"X Because, they tellin me that like these other people have gotta convince the bank, do you understand what I mean?

"T Yeah.

"X And then they get together with them, I mean, then *we* can get together.

"T Right * * *

"X Well that's why I figured, wait till *we*, you know what I mean, if the guy said, what's the use of *us* talking if *I* don't get everything straightened out? Then *we* sit down, you know what I mean?" (Emphasis supplied.)

On July 25 Sanchez met with Evangelista. Also present at the meeting were the Swindler's attorney, Evangelista's accountant and one Mattone, an attorney allegedly representing Flushing. Neither Buster nor the General attended. Mattone offered the Swindler $200,000 for Lockwood Manor plus $6,000 which would be paid to Flushing on account of mortgage arrears. The Swindler declined the offer, informing the gathering that he was then negotiating for a sale of the home to the Swedish Hospital for the sum of $4,300,000.[2]

On July 31 Buster had another phone conversation with the General, part of which dealt with their disappointment at the inconclusive result of the meeting between the Swindler and Evangelista. The transcript of the recorded conversation reflects Buster as saying, partially in English and partially in Italian, "This guy finish with this guy".

The transcript continues:

"X [Buster] - [Italian-Finish it with this guy] that's what I want to tell you.

"T [the General] I see

"X [Italian-What he's got to *pay* to do]

---

**2.** The corrosive effect of the transactions here involved is not fully disclosed by the record. However, the records of this court, of which we can and do take judicial notice, disclose that on or about July 27, 1978 an agreement for the sale of Lockwood Manor was entered into by CCN Realty Corporation, of which Sanchez — the Swindler — was president and principal, and Swedish Hospital. Pursuant to that agreement the sum of $50,000 was deposited in escrow with CCN's attorney, the same attorney who represented Sanchez at the meetings with Buster (Ardito), the General (Tutino), and Evangelista. Yielding to the importunities of Sanchez, the attorney violated his obligation as escrowee and turned that money over to Sanchez to enable him to pay the "vig".

When the deal fell through because Flushing refused to reinstate the mortgage, Swedish Hospital demanded return of the escrow money. Since much of the escrow funds had been consumed by the "vig" payments the attorney was unable to do so. Complaint was made and disciplinary proceedings were instituted. By order dated February 9, 1982, we directed that the attorney be disbarred and that his name be stricken from the roll of attorneys (*Matter of Nadel*, 85 AD2d 8).

"T Uh huh.

"X You understand.

"T Yes-yes.

"X When you hear somebody talk like that

"T [Italian-Forget it]

"X [Italian-Forget it]

"T [Italian-Forget it]

"X Like I tell ya-finish.

"T [Italian-I understand] right

"X Because when the shoes get tight (they'll know we're here).

"T I know what you mean.

"X You know what I mean?

"T Yeah * * *

"T [Italian-It's good to tell him something it's good to tell him something-put something in his head, this way he can understand everything.]

"X Well it's up to you.

"T Yeah.

"X You know what I mean?

"T Yeah.

"X Because when people talk like that, that means they know.

"T Yeah, yeah". (Emphasis supplied.)

On August 8 another meeting was held at a restaurant which was recorded by means of a body tape worn by Sanchez. Present were Sanchez, Tutino, Ardito and Evangelista. The conversation centered about getting the bank or the other persons who were the prospective purchasers of Lockwood Manor and who were represented at the meeting at Evangelista's office on July 25 by Mattone, to make a higher offer for the home. The upshot of the meeting was formulated by Buster in a single sentence addressed to Evangelista: "Help the guy with Jimmy, your friend".

Sanchez and Tutino then left the meeting and, as the Swindler drove the General home the following conversation took place:

"T [The General] All I know is 'er I did everything else in my power, I put you together with this guy now. The guy's waiting for you to present the deal to him.

"R [the Swindler] It's done, okay?

"T That, and I, if it don't happen, what could I tell you. All I'm telling you is one thing.

"R [inaudible] okay?

"T Get this thing resolved, don't think that there's a quarter of a million dollars involved here, that in any way you could say well, I blew the business, and you go away. *You didn't lose no money to banks.* You lost to the people here, I told ya, there's a 100 grand that don't people don't give a * * * if you pay it or not, I, I'm the guy that suffers, and then you got a 100 thousand to them other guys-Tony three tens, Buster ten, forget about it-*you might as well take your family and move to Honolulu*" (emphasis supplied).

### III

The defendant, Buster Ardito, the General and one Xavier "Sam" Salzarulo were thereafter indicted for criminal usury in the first degree and grand larceny in the first degree by means of extortion. Tutino pleaded guilty to both counts of the indictment while Salzarulo pleaded guilty to the crime of criminal usury in the first degree only. Defendant went to trial and was convicted of criminal usury in the first degree but acquitted of grand larceny in the first degree.

By separate indictment defendant, Tutino and Evangelista were indicted for conspiracy in the fourth degree. The General pleaded guilty to that indictment following conviction after trial of one of the many indictments found against him. Evangelista went to trial and was convicted of criminal conspiracy in the fifth degree. After defendant was convicted of criminal usury in the first degree the conspiracy indictment against him was dismissed with the consent of the People. While the record is barren of any

reason for the dismissal, it is fair to assume that it was bottomed upon the mandate of CPL 40.20 (*People v Abbamonte*, 43 NY2d 74; *Matter of Abraham v Justices of N. Y. Supreme Ct. of Bronx County*, 37 NY2d 560; *Matter of Cirillo v Justices of Supreme Ct. of State of N. Y.*, 34 NY2d 990, affg 43 AD2d 4).

Criminal usury in the first degree is defined by statute (Penal Law, § 190.42) as the act of knowingly charging, taking or receiving of "any money or other property as interest on the loan or forebearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period and * * * the actor's conduct was part of a scheme or business of making or collecting usurious loans".

The usury count, after asserting that defendant Tutino had acted in concert in the commission of the necessary substantive acts concluded with the words "said conduct of defendants being a part of a conspiracy and corrupt agreement and a scheme and a business of making and collecting usurious loans". Defendant moved at the preliminary stage of the trial, to strike the words "conspiracy and corrupt agreement". The trial court granted the motion and struck the words. Thereafter it permitted proof establishing prima facie the existence of the conspiracy thus rendering admissible the declarations made by Tutino to Sanchez during the course of the conspiracy for the purpose of binding defendant (*People v Salko*, 47 NY2d 230; *People v Rastelli*, 37 NY2d 240; *People v Luciano*, 277 NY 348). This proof was admissible upon the ground that when, by the nature of the indictment, a series of acts required to be proven are so interlinked that proof of them will establish a conspiracy, the conspiracy may be shown even though the indictment does not allege it (*People v Luciano*, 277 NY 348, *supra*). In *Luciano* the defendant was charged with compulsory prostitution. The indictment contained a total of 90 counts, alleging the placement of a female in a house of prostitution or receiving money from a woman so placed or receiving money from the earnings of a woman so placed. Of these 90 counts, 62 were submitted to the jury. Defendant was found guilty on each count submitted. Although no conspiracy was alleged, proof of a conspiracy

to commit the crimes was permitted and the existence of the conspiracy was established. The court permitted statements made by coconspirators to tie defendant to the substantive crimes even though defendant did not, in many cases, participate in any of the acts constituting the crime and, in some instances, was not even aware of them.

Ardito contends that the rule in *Luciano* has been substantially altered by *People v McGee* (49 NY2d 48). *McGee* teaches (p 57) that: "[A] conspirator's conduct in many instances will suffice to establish liability as an accomplice, but the concepts are, in reality, analytically distinct. To permit mere guilt of conspiracy to establish the defendant's guilt of the substantive crime without any evidence of further action on the part of the defendant, would be to expand the basis of accomplice liability beyond the legislative design".

Thus, it would appear that, to a limited degree, *McGee* has modified *Luciano* (*supra*). *McGee* does not exclude proof of the conspiracy. Indeed, in a case involving usury in the first degree it could not do so for an integral part of the proof which must be established is that the acts of the lender or lenders were "part of a scheme or business of making or collecting usurious loans".

Certainly, the making of a single usurious loan would not fall within the prohibited conduct and it is doubtful whether two or more such loans to a single person would fall within the proscription. When two or more persons are engaged in the making of such loans to two or more persons, the elements of the conspiracy are prima facie present. What *McGee* does require in order that a case be made out is that, in addition to the conspiracy, there be proof of further action on the part of the defendant linking him to the substantive crime charged. To that degree, it limits *Luciano*.

Judged by the standards laid down in *Luciano* (*supra*), as modified by *McGee* (*supra*), we are of the opinion that sufficient proof was adduced to present a fair jury question of defendant's involvement in the substantive crime charged here. First, there are the fortuitous appearances of defendant at four critical stages in the scenario which was

played out. When the emergency loan of $10,000 was made by the General to the Swindler on the deck of Buster's boat, Buster was the only other person aboard the boat. He remained below deck until the moment after the General passed the envelope to the Swindler. He then emerged on deck to be introduced to Sanchez. Secondly, there is the meeting at the Swindler's office at Lockwood Manor when the Swindler was seeking a "legitimate" loan, at which Evangelista was introduced. At this meeting Ardito categorically indicated his lack of interest in making the loan. Thirdly, and by "happenstance", the following week Buster emerged from Evangelista's office in Long Island City just as Sanchez was about to enter the office for a continuance of discussions with respect to the proposed "legitimate" loan. Fourthly, there is defendant's presence at the dinner meeting with Tutino and Evangelista at which a possible sale of Lockwood Manor was discussed with the Swindler and Evangelista haggling over the terms which might be imposed upon the bank or the individual or individuals who had made the original offer.

If this not be sufficient to demonstrate Buster's involvement in the substantive crime, there are the monitored telephone conversations between the "General" and Ardito during which much time is spent on Sanchez. These culminated in the July 31 phone conversations in which Ardito told Tutino to "Finish it with this guy * * * [Tell him] [w]hat he's got to *pay* to do * * * Because when the shoes get tight they'll know we're here". (Emphasis supplied.) Although much of these monitored conversations are deliberately vague, their meaning becomes abundantly clear when viewed in the context of the testimony of Sanchez. In sum, the proof was amply sufficient to establish a jury question of defendant's involvement in the substantive crime.

However, just as more is necessary to establish that Ardito was in the *business* of making usurious loans, so, too, more is necessary to establish the conspiracy. The additional evidence is also furnished by the monitored telephone conversations. They establish both the business and the conspiracy. There are repeated references to Frank (Starace), the operator of Ray's Chris Craft; the "fruit man"

and one "John Eberhardt". Although the references to them are couched in terms of indebtedness for work performed on boats, the true meaning of the words become evident in the context of all of the evidence.

Accordingly, from all the evidence it is plain that questions of fact were presented for determination by the jury. They determined that the evidence was sufficient to link Buster Ardito with the substantive crime and that a conspiracy was made out as a result of which Ardito was bound by the declarations made by Tutino to Sanchez during the course and in furtherance of the conspiracy. No basis exists for disturbing their holding.

### IV

The second issue tendered is that of corroboration. Ordinarily, it would be sufficient to note that Tutino was not a witness at the trial. Hence, although concededly an accomplice within the meaning of CPL 60.22 (subd 2) there was no need for corroboration of the statements made by him to Sanchez. Indeed, where the evidence consists of declarations made by a coconspirator during the course of the conspiracy the rationale for corroboration is lacking (see *People v Cona,* 49 NY2d 26, 35-36). However, the trial court charged that the General was an accomplice as a matter of law. As a necessary corollary it instructed the jury that it was necessary for the prosecution to corroborate his declarations to Sanchez. In so doing, the trial court made its charge to the jury the law of the case (*People v Bell,* 48 NY2d 913). Although that charge imposed upon the People a greater burden than that required by law, on this appeal the prosecution is required to carry that heavier burden.

CPL 60.22 (subd 1) provides: "A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense".

The law does not require that the corroborative evidence, in and of itself, be sufficient to support the conviction. It is sufficient if its nature be such as tends "to connect the defendant with the commission of such offense".

"The corroborative evidence need not show the commission of the crime; it need not show that the defendant was connected with the commission of the crime. (*People* v. *Mayhew,* 150 N.Y. 346, 353; *People* v. *Cohen,* 223 N.Y. 406, 426.) It is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth. The corroboration is not restricted to any particular point * * * It may vary in its nature according to the circumstances of the particular case. Matters in themselves of seeming indifference or light trifles of the time and place of persons meeting may so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime". (*People v Dixon,* 231 NY 111, 116-117.)

"It is pertinent to restate that the function of the independent evidence is not to bolster the details to which the accomplice has testified, but to give reasonable assurance that defendant has not been improperly implicated in the criminal transaction". (*People v Hudson,* 51 NY2d 233, 239; see, also, *People v Smith,* 55 NY2d 945; *People v Daniels,* 37 NY2d 624.)

The required corroboration may be direct or circumstantial (*People v Mullens,* 292 NY 408; *People v Brown,* 30 AD2d 279; *People v Guernsey,* 24 AD2d 811). It may be found in testimony or it may be supplied by the defendant himself in the form of tape recorded conversations (*People v Goldfeld,* 60 AD2d 1). In sum, it must comply with the statutory requirement that it tend "to connect the defendant with the commission of" the crime.

Here, the evidence of linkage is both circumstantial and direct. The appearance of defendant on the critical four occasions linked to a loan to the Swindler and the Swindler's endeavors to extricate himself from his financial distress, a distress in which Ardito purportedly had no interest, is some circumstantial evidence of his involvement with Sanchez. The taped telephone conversations and particularly Ardito's peremptory direction to Tutino to "Finish it with this guy that's what I want to tell you * * * What he's got to pay, to do" furnish direct evidence "tend-

ing to connect defendant with the commission of" the crime charged.

It is plain, therefore, that the prosecution established, prima facie, the corroboration mandated by the charge of the trial court.

## V

Defendant next asserts that the telephonic communications between the General and Buster resulted from wiretap orders improperly issued and must, therefore, be suppressed. Without the proof which resulted from the eavesdrop orders the conspiracy to engage in usury necessarily fails. Absent proof of the conspiracy, the testimony of Sanchez through which the declarations of Tutino made during the course of the conspiracy were brought before the jury, was improperly admitted. In short, as the prosecution conceded upon argument, if proof of the conspiracy fails, there is no basis upon which the conviction may rest.

Defendant bases his argument in support of suppression on *People v Shapiro* (50 NY2d 747, 762-763) which holds that Congress, in enacting title 3 of the Omnibus Crime Control and Safe Streets Act of 1968 imposed "upon the States the minimum constitutional criteria for electronic surveillance legislation mandated by *Berger v New York* (388 US 41) and *Katz v United States* (389 US 347)".

In so doing it permitted the States to adopt standards more restrictive than those adopted by Congress. However, it precluded them from laying down procedures more broadly drawn than those contained in the Federal statute (US Code, tit 18, § 2516, subd [2]). It did so, asserted the Court of Appeals, by pre-empting the field under the Federal supremacy (US Const, art VI), and interstate commerce (US Const, art I, § 8) clauses.

With this as a backdrop, defendant argues that wiretaps are permitted only in those types of cases itemized in the Federal statute, i.e., murder, kidnapping, gambling, robbery, bribery, extortion or dealing in narcotic drugs or other crimes dangerous to life, limb or property and punishable by imprisonment for more than one year. To the extent that CPL 700.05 (subd 8) in enumerating the designated offenses in which an eavesdropping warrant may be

issued transcended the limitation of subdivision (2) of section 2516 of title 18 of the United States Code it is, to that extent, unconstitutional.

We find it unnecessary to deal with the issue raised by defendant for we find that, in this case, the crime for which the eavesdrop warrant was issued falls within the ambit of "other crimes dangerous to life, limb or property". The very comprehensive affidavit submitted by Detective Ronald Marsenison, of the 8th homicide zone, Bronx County, in support of the eavesdrop warrant, refers to a conversation had by George (the code name given by the police to Sanchez) with Tutino in February, 1977 on the day preceding the first loan to the Swindler. During that conversation the General said to Sanchez: "We're not doctors, we're not lawyers. If you don't pay, things happen". The following day, Tutino made the advance to Sanchez.

Tutino is described in the affidavit as "a major organized crime figure associated with the Carmini [sic] Tramunti crime family". Defendant is listed in the affidavit by his many names and is described as: "a known member of organized crime. He is listed as acting consigliari in the Genovese/Tieri crime family and possibly a capo in that family. He is listed as a major narcotics violator #1A. He is associated with other major narcotics violators. Ardito is also known to be involved in loansharking activities * * * Ardito has been previously arrested for extortion, assault, gambling and weapons charges".

In light of the backgrounds of Tutino and Ardito, the statement made by the General to Sanchez on the day prior to the granting of the first loan, and the transfer of the new Cadillac by the Swindler to the General at a time when Sanchez was unable to keep up with his "vig" payments, all of which is related in the Marsenison affidavit, it is plain that when the court signed the eavesdropping warrant it was confronted with a crime fraught with the potential for violence.

Since neither party has addressed the issue of standing we make no comment with respect thereto except to note that the doctrine of automatic standing is no longer the law of this State (*People v Ponder,* 54 NY2d 160) and that the

telephone which was the object of surveillance was listed to Ray's Chris Craft and was maintained in its office which was the office of neither Tutino or Ardito.

## VI

The final major contention advanced by Ardito is that the jury, in finding him guilty of criminal usury in the first degree and acquitting him on the count of grand larceny in the first degree by extortion rendered verdicts which were inconsistent and repugnant which must be set aside and the indictment dismissed.

It is unnecessary to treat with the claim of inconsistency since each count in an indictment is to be treated as if it were a separate indictment. By consequence, mere inconsistency affords no basis for setting aside a conviction (*People v Pugh,* 36 AD2d 845, affd 29 NY2d 909, cert den 406 US 921; *People v Cwikla,* 60 AD2d 40, revd on other grounds 46 NY2d 434). Repugnance, on the other hand, will necessitate setting aside the verdicts and the dismissal of the indictment (*People v Pugh,* 36 AD2d 845, *supra; People v Cwikla,* 60 AD2d 40, *supra*). However, to find repugnancy we must find that the elements of the two crimes were identical (*People v Garcia,* 72 AD2d 356, affd 52 NY2d 716; *People v Rivera,* 77 AD2d 538).

Here, the elements of the two crimes are essentially different. In the one, criminal usury in the first degree, the basic evil sought to be reached and punished is the exaction of an interest rate in excess of 25% per year. The fact that the party by whom the unlawful rate of interest is paid consents thereto is of no moment. The act for which penalty is imposed is the exaction of the unlawful interest rate. On the other hand, property is obtained by extortion when a fear is instilled that if the property is not delivered certain acts will take place. If the transfer of the property is consensual, there is no extortion. Thus, there was no requirement, either in logic or law, that the jury act in a uniform manner with respect to both counts.

To discuss seriatim the numerous other issues raised by defendant would prolong this already long opinion to unreasonable lengths. Let it suffice it to say that we have considered them and find them to be without merit.

Accordingly, we would affirm the judgment convicting defendant of the crime of criminal usury in the first degree.

SULLIVAN, J. P., and SILVERMAN, J., concur with CARRO, J.; ROSS and BLOOM, JJ., dissent in an opinion by BLOOM, J.

Judgment, Supreme Court, Bronx County, rendered on October 1, 1980, reversed, on the law, and the indictment dismissed.