■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LOUIS EVANGELISTA, Appellant. — Judgment of the Supreme Court, Bronx County (Warner, J.), rendered on February 5, 1981, convicting defendant-appellant, upon a jury verdict, of conspiracy in the fifth degree and sentencing him to three years' probation and a $1,000 fine, reversed, on the law, and the indictment dismissed. By a one-count indictment, appellant was charged, while acting in concert with Ralph Tutino and John Ardito, with the crime of conspiracy in the fourth degree. The instant indictment was dismissed as to Ardito after his conviction and sentencing on a separate indictment, which separate indictment was thereafter dismissed in *People v Ardito* (86 AD2d 144). Tutino was indicted in 10 separate indictments related to loan-sharking activities, including the instant indictment. After being found guilty by a jury on one of the indictments, Tutino pleaded guilty to this indictment as well as the eight remaining indictments. Tutino's convictions were affirmed by this court in *People v Tutino* (87 AD2d 1009). In substance, this indictment charges that appellant, during the period extending from the summer of 1978 to the summer of 1979, was part of a conspiracy to commit the crime of usury in the first degree. The indictment contains six overt acts. Appellant is specifically mentioned in four of these acts. In none of these acts in which appellant's name is mentioned, is it alleged that appellant himself discussed anything related to the collection of usurious interest since all of these overt acts deal with appellant's efforts to purchase the business of one Richard Sanchez. It was the People's theory that appellant's role in the conspiracy was to purchase Sanchez' business so that Sanchez would be able to repay the usurious loans made to Sanchez by Tutino. In February, 1977 Sanchez bought Lockwood Manor

(Manor), an adult home, located in Westchester County, from Nathan Wagner and Jay Feiner. At the time of purchase, the Manor was in debt for hundreds of thousands of dollars. Sanchez assumed a first mortgage in the sum of $2,845,000 held by the Flushing Savings Bank (Flushing). The average monthly mortgage payment to Flushing was $28,000. Besides the Flushing mortgage, Sanchez incurred a debt secured by a $275,000 second mortgage from the "Money Store" and one in an amount of $250,000 for equipment and supplies. To solve his money problems with respect to the Manor, Sanchez turned to loan sharks. Between February, 1977 and September, 1979, Sanchez borrowed approximately $500,000 from Tutino at an annual interest rate that varied between 52% and 104%. Sometime in 1978 Sanchez decided that in order to stay in business, he needed a large amount of cash at lower interest rates so that, among other things, he could pay Flushing on time and reduce the principal amount owed the loan sharks. Sanchez expressed this desire to Tutino and Ardito; and Ardito told Sanchez that he might have someone who would lend Sanchez money on this basis. Ardito recommended appellant. Appellant, however, never provided the requisite financing. Immediately prior to the trial, the appellant moved for a preliminary hearing on the issue of whether the prosecutor could make a prima facie showing of the existence of a conspiracy in which appellant was involved. Under the existing case law, this would be a mandatory prerequisite to the admission in evidence of any coconspirators' statements. (*People v Berkowitz*, 50 NY2d 333; *People v Salko*, 47 NY2d 230.) The court granted the application and held a hearing. The sole evidence at the hearing consisted of three tape recordings, which were later admitted into evidence at the trial. The first tape was of a telephone conversation between Sanchez and appellant on July 23, 1979. Sanchez telephoned appellant. Appellant said "You got * * * You've seen our friend?" Sanchez said yes and asked for a meeting with appellant. Sanchez and appellant then set a time for a meeting. On the evening of July 25, 1979, Sanchez met the appellant at the latter's office. Sanchez surreptiously recorded this meeting. This tape was one of the three introduced by the People to show appellant's involvement in the conspiracy. Present at the meeting were appellant, appellant's accountant Martin Reffsin, one Joseph Mattone, an attorney, Sanchez and Sanchezs' attorney Arthur Nadel. Examination of the transcript reveals that essentially the parties reviewed the financial situation of Lockwood Manor and the reluctance of Flushing to deal further with Sanchez. Appellant said there "must be something fish [*sic*] in there, somebody doesn't put all the cards on the table". Sanchez asked appellant if he had inquired as to why the bank would not accept the money tendered by Sanchez. Appellant said he was told that Sanchez had not made the agreed-upon payments. In response to a question from Mattone, Nadel conceded that the amount offered Flushing was under the original agreement, not the agreement which had been modified with a higher interest rate. Upon further discussion concerning the mortgage and the bank, the appellant repeated that the bank was not being paid and asked "Where's the money?" He received the reply from Sanchez that "Wagner took it to paid [*sic*] his principal, his payables down". Finally the meeting seemed to settle into a deadlock with appellant offering Sanchez $200,000 to buy the Manor. Appellant stated at this meeting that "I am involved for only one reason, and you know why?" The People offered no persuasive evidence as to what appellant meant but they implied that appellant was only involved to insure that Sanchez would pay off his debts to the loan sharks. At other times, in reviewing the financial picture, appellant interjected comments such as "What else is involved besides that? Is there anything else that you know that we don't know?" and at another point "We know the bank is $3,400,000. We

know the Money Savings Store the Money Store is $250,000. Who's getting the balance? Am I going in the wrong direction?" At one point Reffsin said: "What he's [Sanchez] saying is he [Sanchez] didn't get it. It went to pay off operating expenses. It went to pay off our friend, Mr. __". Seconds after, an unidentified voice said "Nathan". The conversation following made clear this referred to Nathan Wagner. Finally, on August 8, 1979, when appellant, Sanchez, Tutino and Ardito met together in a restaurant, Sanchez secretly recorded this meeting. After discussion of the selling price of the Manor and what money Sanchez would receive, appellant stated that "Mattone wanted to pay Sanchez $200,000 and take over Lockwood Manor". Appellant then asked: "And what are you supposed to do with $200,000? give it to the bank or what?" Neither Sanchez, Tutino or Ardito answered appellant's question. Examination of this transcript does not reveal that anything incriminating was said in appellant's presence about loan sharking activities or that Sanchez was under any compulsion to make a deal with appellant. After these tapes were played, without any testimony and after oral argument, the court, without making any findings of fact held that "the People have a prima facie showing that a conspiracy involving this defendant did exist as alleged in the indictment". At the conclusion of the People's case at trial, appellant moved to dismiss the indictment for failure to make out a prima facie case. He also asked the court to reconsider its ruling concerning the admissibility of out-of-court declarations of coconspirators on the ground that there was insufficient independent proof to establish, prima facie, the existence of a conspiracy. The court denied both applications. We conclude this was error. The three tapes which have been summarized in some detail did not spell out a prima facie case of conspiracy on the part of appellant. "Since a prima facie case of conspiracy was not established the acts and utterances of the alleged coconspirators could not be attributed to the defendant". (*People v Edwards,* 77 AD2d 786; see, also, *People v Salko, supra; People v Berkowitz, supra.*) An analysis of the People's case against appellant at the trial reveals no more than the following: Tutino and Ardito put Sanchez in touch with appellant in 1978 to get a loan at low interest rates. In a 1978 meeting, appellant allegedly asked Sanchez what Sanchez "owed the street". Appellant in 1978 checked with Flusing concerning Sanchez' relationship with Flushing. In 1979 Tutino and Ardito urged Sanchez to revive negotiations with appellant. Appellant and Sanchez again entered into negotiations in 1979 and at a meeting appellant told Sanchez "I am involved for only one reason, and you know why?" Appellant offered Sanchez $200,000 for his equity in Lockwood Manor and Tutino and Ardito urged Sanchez to take this deal. Again, at the conclusion of their proof at trial, the People did not make out a prima facie case that appellant was part of a conspiracy with Tutino and Ardito to collect the money that had been lent to Sanchez. Examination of the transcripts in which Sanchez spoke with appellant reveals that appellant at all times dealt with Sanchez on a business-like basis and asked the type of questions that one would expect a businessman to ask. No evidence is revealed to make out a prima facie case that appellant was knowingly part of a conspiracy with Tutino and Ardito to collect a usury debt. "[M]ere vagueness and suspicion do not rise to the level of evidence, and these conversations do not rise to the level of the proof required to permit the submission of these questions to a jury". (*People v Ardito,* 86 AD2d 144, 147-148, *supra.*) Concur — Kupferman, J. P., Sullivan, Markewich, Fein and Asch, JJ.