THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JOSEPH G. CHRISTOPHER, Appellant.

Fourth Department, May 25, 1984

506

APPEARANCES OF COUNSEL

*Rose H. Sconiers (John Ziegler* of counsel), for appellant.

*Richard J. Arcara, District Attorney (John DeFranks* of counsel), for respondent.

OPINION OF THE COURT

Moule, J.

Defendant was convicted on three counts of second degree murder arising from the shooting deaths of three black males over a 26-hour period in September, 1980 on

the east side of Buffalo. Defendant raises several contentions on appeal in support of his claim that his convictions must be reversed. An analysis of these contentions requires a recitation of the facts surrounding these homicides and the extensive pretrial proceedings which were conducted.

I

Glenn Dunn, a 14-year-old black male, was shot in the side of the head with a .22 caliber gun while he waited in a car outside a Tops Supermarket at the corner of Genesee and Floss Streets for a friend who had gone into the store. The shooting occurred at approximately 10:00 P.M. on September 22, 1980. Robert Oddo left his home at 9:30 P.M. that same evening and walked to the Tops market to buy cigarettes. Oddo saw a white male, wearing a hooded sweatshirt, sitting near the store and passed within arm's reach of him upon entering the store. Oddo noticed a brown shopping bag sitting at the man's feet. Oddo spent about five minutes in the store and, upon leaving, observed the man he had seen earlier standing by a car at the rear of the parking lot. Oddo witnessed the man fire four shots into the car. When he was finished shooting, the assailant turned around and Oddo could again see his face before the man fled. Oddo later described the man he had seen as being in his twenties, having wavy, light-brown hair and wearing silver, metal frame glasses. Police later recovered three shell casings and bullet fragments from the scene of the crime.

At approximately 12:20 P.M. on September 23, 1980, Harold Green, a 32-year-old black male, was shot and killed by two gunshots to the head from a .22 caliber weapon. At the time, Green was seated in his car in the parking lot of a Burger King restaurant on Union Road in Cheektowaga. Linda Snyder had gone to the same restaurant for lunch at approximately 12:05 P.M. and was walking out of the restaurant when the shooting occurred. As she approached her car, she saw a man running behind the car next to hers. The man ran to a restaurant adjacent to the Burger King and disappeared behind a corner of it. Snyder described the man as being about 5 feet 7 inches or 5 feet 8 inches tall and weighing approximately 150

pounds. She stated that he was wearing a waist-length, khaki-colored jacket, khaki trousers and a khaki-colored hat with a brim all the way around. She thought he was a younger man because of the way he ran; she also noticed that he was holding a crumpled brown grocery bag under his arms. Police recovered one shell casing and bullet fragments at the scene.

Later that same day, at approximately 11:30 P.M., Emanuel Thomas, a 30-year-old black male, was killed by a single shot to the head from a .22 caliber weapon. Thomas was shot as he walked with a friend down Zenner Street by an assailant, described only as a white 18- to 19-year-old male. The assailant was observed wearing a watch cap. Police recovered three shell casings and bullet fragments at the scene.

An extensive investigation ultimately led police to suspect defendant Joseph Christopher, a United States Army private stationed at Fort Benning, Georgia. Christopher had been imprisoned in the Fort Benning stockade in January, 1981 for attacking a black male soldier and was awaiting trial on the charge of assault with intent to kill. While he was awaiting trial on that charge, defendant began to fast for fear the food he was being served was poisoned. Defendant lost between 25 and 30 pounds and was subsequently transferred to the psychiatric unit (the "B-4 ward") at the base hospital. Defendant was released from the hospital and returned to the stockade in early April but was readmitted to the psychiatric unit after he had cut himself with a razor blade.

Captain Bernard Burgess, a staff nurse on the B-4 ward, conducted an intake interview of defendant for readmission to the unit on April 10, 1981. During this standard question and answer session, defendant asked Burgess if he was aware of the killings in Buffalo. When Burgess replied that he was not, defendant told him that he had killed 13 people, some with a .22 caliber gun.[1] When Burgess asked why he had killed the people, defendant said he had done it because of an uncontrollable impulse. Defendant told Burgess that he intended to notify law

---

1. Defendant had lived in Buffalo up until he reported to Fort Benning for training on November 13, 1980. He had enlisted in the Army on September 19, 1980.

enforcement officials of his involvement in the killings. Defendant made similar admissions to Specialist Christopher Corwin,[2] an MP assigned to guard defendant while he was at the psychiatric unit, and Lieutenant Dorothy Anderson, a psychiatric nurse on the B-4 ward. Defendant approached Anderson on April 13, 1981 after a group therapy session and told her that he had something he wanted to tell her about the commission of a crime. Anderson asked defendant if he had committed a crime and defendant responded that he had murdered some people, but did not remember how many. In response to Anderson's further inquiries, defendant stated that all of the victims were nonwhite males and that all of the killings had occurred between September, 1980 and January, 1981.

On April 24, 1981, defendant asked to speak with Captain Aldrich Johnson, the officer in charge of the Fort Benning stockade. At this time Johnson was aware that defendant, principally as a result of the statements he had made to Captain Burgess, Specialist Corwin and Lieutenant Anderson and his physical resemblance to the composite description police had put together, had become a suspect in the Buffalo killings. The two men engaged in a lengthy conversation in Johnson's office covering many topics. Johnson, who knew that defendant had told others at Fort Benning of his involvement in the Buffalo killings, sought to gain defendant's confidence so that defendant would speak freely with him; Johnson did, however, advise defendant that he would report anything defendant told him to his superiors. Nonetheless, defendant refused to say anything about the killings. At one point, a female friend of Johnson's stopped by and pointedly asked defendant if he had committed the crimes in Buffalo; defendant's response was that "people say I did".

Johnson and defendant spoke again on both April 25 and 26 during routine checks of the stockade facility made by

---

**2.** Defendant spoke to Corwin in late March or early April, 1981 while Corwin was guarding defendant on the B-4 ward. Corwin was watching defendant while he slept when defendant awoke and asked Corwin whether he knew that defendant "was a mass murderer in Buffalo". Corwin told defendant that he did "not want to hear any of this". Defendant, nevertheless, went on to say that he had "killed some people in New York". Corwin again told defendant that he did not want to hear about the killings and the conversation ended. Corwin subsequently related this information to his guard commander.

Johnson. Both of these conversations were initiated by defendant. On April 25, defendant made a dietary request to Johnson and also asked if he could speak to the chaplain. On April 26, defendant asked to speak with Johnson to ask permission to have a musical instrument in the stockade. When Johnson approached defendant's cell, defendant told him he had done "the thing" in Buffalo. Johnson then asked defendant if he wanted to speak with the detectives from Buffalo, but he declined. This last conversation was overheard by Correction Specialist Richard Morganstern.

Warrants to search defendant's home at 89 Weber Street in the City of Buffalo, a shed adjacent to the home and a family hunting camp in Ellington, New York, were sought by Buffalo police on April 22, 1981, based principally upon the following grounds: defendant's admissions; his physical resemblance to the composite drawing of the assailant; the fact that defendant was known to previously have possessed a Ruger 10/.22 gun, the type of gun firearms experts believed was used in the Dunn, Green and Thomas homicides, and various hunting knives;[3] and defendant's unprovoked attack on a black male soldier. The warrants were issued and authorized police to seize defendant's Ruger 10/.22, .22 caliber ammunition, .22 caliber expended casings, and various types of hats, knives and jackets. The searches were conducted the next day; police seized various .22 caliber ammunition, several knives, a green Army-style rain jacket, a leather brim hat, a black knitted watch cap, and three spent .22 caliber casings, one of which was bent.

Defendant was indicted for the murders of Dunn, Green and Thomas on April 29, 1981.[4] A lineup was subsequently held on May 12, 1981. While Robert Oddo did not identify defendant at the lineup as the man he saw shoot Glenn Dunn, he later told an officer who had previously questioned him that he could make an identification. Oddo then

---

**3.** The knives were significant in demonstrating probable cause because defendant was, at that time, a suspect in a series of stabbings which had occurred between December 22, 1980 and January 1, 1981. The stabbings occurred in New York, Buffalo and Rochester and resulted in six fatalities. Defendant matched the general description of the assailant and, significantly, was on leave from Fort Benning from December 19, 1980 to January 2, 1981. Further, defendant was believed to have traveled by bus through the New York area en route to his Buffalo home on the date of the New York attacks.

**4.** This indictment was superseded by a second indictment on May 28, 1981.

identified defendant as the man he had seen shoot Glenn Dunn. He explained that he had initially chosen not to make a positive identification so as to avoid "getting involved".

## II

Defendant was arraigned on May 11, 1981 and an order directing the examination of defendant pursuant to CPL article 730 was granted at that time. Defendant was then examined by two psychiatrists, Drs. Molnar and Wadsworth, and found fit to proceed.

Defense counsel thereafter moved for the suppression of the following: defendant's statements to military personnel at Fort Benning; the eyewitness identification of defendant by Oddo and the other people who had identified him as being at Tops on the night of the Dunn killing; and the evidence police had obtained in searching defendant's house, the shed attached to the house and the family hunting camp. After lengthy oral argument on these matters, the hearing court ruled on defendant's motions. It held that the lineups were not suggestively conducted and, hence, the eyewitness identifications should not be suppressed. Further, it found that the search warrants issued in this case were supported by sufficient probable cause and, additionally, that the articles seized by police were within the scope and obvious intendment of the warrants and supporting papers. Finally, the court partially granted defendant's motion to suppress the statements he had made at Fort Benning. The court suppressed defendant's response to Corwin's inquiry after defendant told him he was a mass murderer, but found that the statements were otherwise voluntary and spontaneous and not the result of any interrogation by Corwin. The court also suppressed the April 24, 1981 conversation between Aldrich Johnson and defendant.[5]

As to the statements made to Nurses Anderson and Burgess, the court denied the suppression motion stating that "[t]hey were not persons acting under direction of or in cooperation with law enforcement either military or non-military". The court rejected defendant's claim that the

---

**5.** The ground(s) for this ruling is not apparent from the court's order.

statements made to Anderson and Burgess were privileged communications, finding that defendant did not contemplate confidentiality when he made them.

After the court denied defendant's motion for a severance of the three second degree murder charges, the case proceeded to jury selection.

After jury selection had begun, defendant informed his counsel that he wished to waive his right to a jury trial. At this point, defense counsel requested further CPL article 730 competency examinations; this request was granted by the court and defendant was subsequently re-examined by Drs. Molnar and Wadsworth. While Molnar once again found defendant competent to stand trial, Wadsworth altered his previous opinion and found that defendant was unable to assist in his defense and, hence, incompetent to stand trial. Following the receipt of the doctors' reports, the court directed further CPL article 730 examinations to determine whether defendant had the capacity to understand the proceedings against him and assist in his own defense. Pursuant to that order, defendant was then examined by Drs. Joseph, Park and Rubenstein. Rubenstein found defendant to be competent, but Park and Joseph both determined that defendant lacked the capacity to assist in his own defense.

A competency hearing was then held at which Drs. Rubenstein and Molnar testified for the People and Drs. Park, Joseph and Wadsworth testified on behalf of the defense. Additionally, one of the prosecutors testified that, during the pretrial proceedings, he had overheard defendant conversing with his counsel demonstrating his ability to assist in his own defense. The court also engaged in a lengthy discussion with defendant concerning his age, education and familiarity with the criminal justice system. During this colloquy, defendant repeatedly refused to give his reasons for waiving his right to a jury trial. The court found that the People had failed to show, by a preponderance of the evidence, that defendant was capable of assisting in his own defense and, hence, competent to stand trial. Accordingly, the court temporarily committed defendant to the custody of the State Commissioner of Mental Hygiene

for treatment. Defendant was then sent to the Mid-Hudson Psychiatric Center.

After spending about two months at Mid-Hudson, defendant was certified ready for trial by the director of the facility. After speaking with defendant upon his return from Mid-Hudson, defense counsel expressed to the court their belief that defendant's condition was no different from what it had been prior to his being sent to Mid-Hudson and requested a second competency hearing. Defendant, however, adamantly opposed his counsel's attempts to have him declared unfit for trial. Defendant went so far as to bring a copy of CPL article 730 into court and argue that, since the statute relating to competency hearings provided that either the defendant or the District Attorney could request a hearing, *his attorneys* were without power to request a hearing in contravention of his wishes. The court, on its own motion, elected to hold a second competency hearing to satisfy itself of defendant's capacity to stand trial.

The court determined that the only psychiatric testimony it was going to initially allow at the CPL 730.30 (subd 2) hearing it had called for was the testimony of the Mid-Hudson psychiatrists who had prepared the reports underlying the Superintendent's decision that defendant was fit to proceed. While the court denied defense counsel's request for further psychiatric examinations conducted by the same psychiatrists who had examined defendant prior to the first competency hearing,[6] it left open the possibility that further examinations might be appropriate if it was not satisfied with the expert testimony of the Mid-Hudson psychiatrists. The court indicated, however, that defense counsel and other appropriate witnesses could testify on defendant's behalf at the upcoming hearing. Hence, the only limitation placed upon the defense at the hearing was that it was not allowed to present expert testimony regarding defendant's psychiatric condition.

The sole witness to testify at the second competency hearing was Dr. Chellappa, the psychiatrist charged with defendant's care at Mid-Hudson. Chellappa testified at the

---

6. Defense counsel was seeking funds from the court to conduct the proposed examinations due to defendant's indigency.

hearing that he did not see any evidence of mental illness from the time defendant was admitted to Mid-Hudson. He also stated that, during his stay at Mid-Hudson, defendant's mental state improved and he became less withdrawn and more verbal with the staff. Chellappa testified that defendant told him he did not want a jury trial because he was afraid the jurors would be affected by the publicity surrounding the case. Dr. Chellappa concluded that it was defense counsel's inability to establish a rapport with defendant that led to any communication problems between them. The court ultimately determined that defendant was not an incapacitated person, based upon the following factors: the testimony of Dr. Chellappa, which it found to be convincing; the court's observations of defendant speaking with his attorneys; the court's various conversations with defendant; and defense counsel's earlier position that defendant was competent to stand a jury trial.[7]

After it had determined that defendant was competent to stand trial, the court advised defendant of his right to waive a jury trial as follows: "First of all, as you know, as you were told previously, the defendant may at any time before trial waive a jury trial and consent to a trial without a jury of the indictment. Such waiver must be in writing and must be signed by the defendant in person, in open Court, in the presence of the Court and with the approval of the Court. The Court must approve the execution of such waiver unless it determines that it is tendered as a stratagem to produce an otherwise impermissible procedural advantage or that the defendant is not fully aware of the consequences of the choice he is making. If the Court disapproves the waiver, it must state upon the record its reasons for such disapproval." The court then went on to thoroughly explain the "advantages" offered to a criminal defendant by a jury trial and to express its opinion that defendant should elect to be tried by a jury. Defendant repeatedly stated that he understood what the court was saying and continued, contrary to his attorneys' advice, to

---

**7.** Defense counsel was willing prior to the first competency hearing to withdraw the claim of defendant's incompetence if the court would not approve defendant's jury waiver.

request a jury waiver. Nonetheless, the court asked defendant to heed the advice of his attorneys and adjourned the proceeding until the next day so as to give him a chance to think his decision over.

The next day defendant again stated that he wished to waive a jury trial. When asked if he understood that a nonjury trial meant trial by a Judge, defendant replied: "Your Honor, we have been over this on many occasions. You asked me, told me I was going to come here this morning and you would pose the same question again, jury or non-jury trial. I'm here. I said non-jury trial." The court then asked counsel whether they had spoken with defendant about the matter since the day before and was informed that they had. In response to a final inquiry by the court concerning whether he understood what he was doing, defendant responded: "Your Honor, I have been sitting here for I don't know how long, and I have made my decision and that's the way I'm.going to stand." The court thereafter concluded: "Well, the Court, as you know, yesterday found that the Court is satisfied the defendant is not an incapacitated person, meaning that he is not a defendant who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense. The matter has been reviewed so many times with the defendant by me and by his counsel both presently and in the past several months, that I'm satisfied as to the requirements of Criminal Procedure Law Section 320.10 and I make the findings contained herein."

### III

At trial, Robert Oddo testified that he saw defendant shoot Glenn Dunn at approximately 9:45 P.M. on September 22, 1980. After fully explaining the opportunity that he had to view defendant at the crime scene, he testified that on May 12, 1981 he identified the defendant at a police lineup. Finally, he testified that he initially lied about not identifying defendant because of his reluctance to become involved.

Madona Gorney, another supermarket patron, fully corroborated the details of Oddo's testimony. After describing the dress, demeanor and position of a man she observed near the store entrance immediately prior to the Dunn

murder, she identified defendant as that man. Gorney also recounted that on May 12, 1981 she identified defendant during a pretrial lineup.

David Robinson, a close personal friend of the defendant, also testified for the prosecution. He said that he was generally familiar with firearms and had seen the defendant in possession of a Ruger 10/.22 rifle on many occasions during the period from 1976 to 1979 at the defendant's home. To his knowledge, this rifle had never been disposed of.

Through the numerous other witnesses who testified, the police were able to piece together a description of the assailant and a list of unusual clothing and other personal items that would later circumstantially link defendant to the Glenn Dunn, Harold Green and Emanuel Thomas murders.

The firearms identification testimony provided by Michael Dujanovich was a critical part of the People's case. Employed by the Erie County Department of Central Police Services Forensic Laboratory, Dujanovich provided the firearms identification testimony that linked defendant to all three homicides. Based on his expert opinion that ten .22 caliber cartridges, seven recovered at the scene of the three murders and three seized from the defendant's home and hunting camp, were all fired from the same 10/.22 caliber Ruger semiautomatic rifle, the prosecution concluded that defendant was the lone gunman responsible for the ".22 caliber killings".

Robert Perrigo, the director of the Erie County Forensic Laboratory and supervisor of Mr. Dujanovich, next testified that he made an independent analysis of the cartridges and concurred in Dujanovich's conclusion that they were fired from the same gun.

Finally, the People concluded their direct case with testimony from: Father Michael Freeman; Private Christopher Corwin; Captain Bernard Burgess; Lieutenant Dorothy Anderson and Correction Specialist Richard Morganstern. All of these witnesses testified that defendant admitted to them, during various conversations, that he was responsible for killing numerous black men in Buffalo and in New York City.

At the close of proof, defendant's motion to dismiss the charges for insufficiency of proof was denied. On April 27, 1982 the court returned a guilty verdict on each of the second degree murder counts. At sentencing, on May 24, 1982, the court first denied the defendant's motion to set aside the verdicts and then sentenced him to consecutive indeterminate terms of incarceration of 25 years to life on count one, 20 years to life on count two, and 15 years to life on count three.

## IV

Defendant raises seven contentions on appeal: (1) that he was denied due process of law when the hearing court refused to allow him to present expert psychiatric testimony at the second competency hearing; (2) that the court erred in accepting his written jury waiver; (3) that he was deprived of a fair trial by reason of the prosecution's failure to turn over favorable firearms evidence prior to trial; (4) that the warrants issued for the search of defendant's home and his family's hunting camp were not supported by probable cause, that certain items were seized beyond the scope of the warrant and, further, that the court erred in refusing to hold a hearing on the question of whether the affiant made false and misleading statements in support of the warrants; (5) that the hearing court erred in refusing to suppress certain conversations between himself and various persons at Martin Army Hospital; (6) that the trial court erred in refusing to sever the three second degree murder counts in the indictment; and (7) that defendant's convictions under the second and third counts of the indictment were based upon insufficient evidence.

Defendant's first contention is that he was deprived of due process of law when the hearing court refused to allow him to present expert psychiatric testimony at the second competency hearing. In analyzing this contention, it is necessary to review both CPL article 730, the statutory framework governing competency determinations, and the procedures employed by the court in this case.

When defendant was returned from Mid-Hudson, he was entitled, via CPL 730.60 (subd 2) and 730.30 (subd 2), to request a second competency hearing. CPL 730.60 (subd 2), governing the procedures to be followed after a defendant

is found competent to stand trial by the superintendent of the facility where he was sent, provides in relevant part: "[W]hen a defendant is in the custody of the commissioner pursuant to a temporary order of observation or an order of commitment or an order of retention, the criminal action pending against the defendant in the court that issued such order is suspended until the superintendent of the institution in which the defendant is confined determines that he is no longer an incapacitated person. In that event, the court that issued such order and the appropriate district attorney must be notified, in writing, by the superintendent of his determination. The court must thereupon proceed in accordance with the provisions of subdivision two of section 730.30 of this chapter." CPL 730.30 (subd 2) provides: "When the examination reports submitted to the court show that each psychiatric examiner is of the opinion that the defendant is not an incapacitated person, the court may, on its own motion, conduct a hearing to determine the issue of capacity, and it must conduct a hearing upon motion therefor by the defendant or by the district attorney. If no motion for a hearing is made, the criminal action against the defendant must proceed. If, following a hearing, the court is satisfied that the defendant is not an incapacitated person, the criminal action against him must proceed; if the court is not so satisfied, it must issue a further order of examination directing that the defendant be examined by different psychiatric examiners designated by the director."

Since the report submitted to the court in this instance, completed by Dr. Chellappa and approved by the Superintendent of Mid-Hudson, concluded that defendant was not an incapacitated person, a second competency hearing would have been required if either the defendant or the District Attorney had so requested. Neither of these parties, however, requested a second hearing; indeed, defendant strenuously argued against his own counsel's attempts to have him declared unfit for trial. Nonetheless, the court held a second capacity hearing on its own motion.

■ In determining whether the hearing court's refusal to allow the defense to present its own expert psychiatric testimony at the second competency hearing deprived defendant of due process, it is important to note that CPL

article 730 does not specifically state what procedures are to be followed at a capacity hearing. Additionally, there is a little helpful case law concerning hearings under article 730 in general (see, e.g., *People v Gans,* 119 Misc 2d 843, 846; *People v Angelillo,* 105 Misc 2d 338; *People ex rel. Anderson v Superintendent of Creedmoor State Hosp.,* 40 NYS2d 84 [decided under Code Crim Pro, §§ 662-a, 662-b]) and none dealing with the situation presented here: whether a defendant is entitled to present expert psychiatric testimony at a second competency hearing held on the court's own motion. A review of the circumstances surrounding the court's decision leads to the conclusion that the court's action was justified and that defendant was not deprived of due process.

Defendant, himself, steadfastly maintained that he was competent to stand trial and refused to request that a second hearing be held. He went so far as to argue that no hearing should be held under article 730 since neither he nor the District Attorney had requested one (CPL 730.30, subd 2). In ordering a hearing on its own motion, the court was obviously concerned with protecting the defendant's rights; it wanted to assure itself that defendant was competent to stand trial. In assessing defendant's current mental state, the court felt that the most relevant expert evidence available was the testimony of the doctors who had examined defendant at Mid-Hudson and, accordingly, limited the psychiatrists who could testify at the hearing to those who examined defendant at Mid-Hudson. Since the court ordered the hearing on its own motion to resolve any doubts it had about defendant's competency, we believe it was reasonable for it to limit the expert testimony produced at the hearing. The legislative history of the 1981 amendment to CPL 730.60 (subd 2) supports such a flexible interpretation of the hearing required after a defendant has been certified ready for trial: "Although a defendant is currently entitled to a capacity hearing after an initial psychiatric examination current language in § 730.60 (2) does not explicitly state that he is so entitled after a temporary order of observation or an order to commitment or retention. This bill ensures that the court, the district attorney and the defendant retain the right to contest the

determination of the department. Passage of this bill will prevent the mental hygiene department from making a determination of a defendant's capacity without the court system's assent. Since the Court has made an initial determination on a defendant's capacity, it should have the opportunity to conduct a new hearing before accepting the department's findings." (NY Legis Ann, 1981, p 424.) The thrust of this language is to assure that, upon request of the defendant, District Attorney or the court, the Mental Hygiene Department's determination will be reviewed; it does not mandate that a full adversary hearing be held in every instance.

Additional support for the court's action comes from the last sentence of CPL 730.30 (subd 2): "If, following a hearing, the court is satisfied that the defendant is not an incapacitated person, the criminal action against him must proceed; *if the court is not so satisfied, it must issue a further order of examination directing that the defendant be examined by different psychiatric examiners designated by the director*" (emphasis added). The logical import of this language is that a limited initial hearing should be held and, if the court is still not satisfied as to defendant's competency, a further hearing conducted at which other psychiatrists would be allowed to testify. This is precisely what the court did in this case: while it limited expert testimony to psychiatrists who had examined defendant at Mid-Hudson, it left open the possibility that future examinations by different psychiatrists might be appropriate if, after the initial hearing, it was not satisfied as to defendant's capacity to stand trial.

It is also important to note that defendant was not deprived of a meaningful opportunity to be heard at the second competency hearing. Defense counsel was given an extensive opportunity to cross-examine Dr. Chellappa and, presumably from the court's earlier recognition that case law allowed certain lay persons to testify at competency hearings, could have produced nonexpert testimony concerning his behavior. Finally, the court's decision explicitly took into consideration the testimony of the three psychiatrists who had testified on behalf of defendant at the first competency hearing. Thus, the court's action did

not amount to a deprivation of defendant's right to due process; the court's action can best be summarized as an attempt to protect defendant's rights without resorting to a renewed battle of expert witnesses unless it was absolutely necessary to do so.

Defendant's second contention is that the court erred in accepting his written jury waiver.

A defendant has a constitutional right to waive a jury trial (NY Const, art I, § 2; *People v Davis,* 49 NY2d 114; *People v Duchin,* 12 NY2d 351). Here, the court completely explained the requirements of a jury waiver, informed defendant of the differences between jury and nonjury trials, and advised defendant not to waive his right to be tried by a jury because of the advantages it offered to a criminal defendant. Defendant consistently stated he understood what the court was saying, but persisted in his request for a jury waiver.

■ Given this extensive colloquy between the court and defendant and the time given defendant to consult with his attorneys and consider his alternatives, "[i]t cannot be said that defendant's assertions of his constitutional rights were not made knowingly and understandingly, based on an intelligent, informed judgment" (*People v Davis, supra,* p 119). To have denied defendant's request under these circumstances would have constituted reversible error under the holding of *People v Davis (supra).* In reversing defendant's conviction in *Davis,* the court stated: "If the rights of self-representation and of waiver of jury trial were not to be honored on this record, it is unlikely that either ever would be. Examination of this record fails to suggest any further action or submission defendant might have taken or made in support of his right or intention to exercise his constitutional privileges. By similar token the same examination discloses that the trial court was wholly convinced that it would not be in the best interests of defendant either to waive a trial by jury or to represent himself rather than to be represented by counsel. The inference may be drawn that the trial court — unquestionably in furtherance of what it perceived to be defendant's best interests — was determined to deny defendant's applications no matter what he said or what the record other-

wise showed. We conclude, however, that in its rulings the court assumed to itself authority and responsibility for determining that it would not be in defendant's interest for him either to waive a jury trial or to represent himself. In so doing the court arrogated to itself and denied to defendant the exercise of rights constitutionally guaranteed to him" (49 NY2d 114, 120, *supra*).

Here, the court properly considered defendant's wishes and did not arrogate to itself the ultimate decision of whether to waive the jury trial. The court, thus, properly accepted defendant's jury waiver.

Defendant's third contention is three pronged: (a) that he was denied a fair trial when the prosecution failed to turn over favorable firearms evidence prior to trial; (b) that he was improperly denied discovery of laboratory notes as required by CPL 240.20 (subd 1, par [c]); and (c) that testimony of Robert Perrigo, a firearms expert, should have been precluded because of the prosecution's failure to make his conclusions known during pretrial discovery.

With respect to the firearms evidence, Michael Dujanovich, a firearms identification examiner, testified concerning ten .22 caliber cartridge casings offered as evidence against the defendant. The casings were identified as follows: exhibits 21, 22 and 23 were the three fired casings found at the scene of the Glenn Dunn homicide; exhibits 26, 27 and 28 were those fired casings found at the scene of the Emanuel Thomas homicide; exhibit 52 was the sole fired casing found at the scene of the Harold Green homicide; exhibit 97 was the misfired casing found at the defendant's home; and exhibits 102-A and 102-B were the two fired casings found at a hunting cabin owned by defendant's family.

Dujanovich testified that the science of firearms identification involves the analysis of markings on ammunition components. From an analysis of "class characteristics" of spent casings, it is possible to determine if two or more of such were fired in the same type or make of weapon. In determining whether particular casings came from the same gun, an expert looks for repeating microscopic striations called "individual characteristics". Where sufficient common striations appear, there is a very low probability

that the casings were discharged from different weapons and thus, conversely, a high probability they were discharged from the same weapon. Applying direct casing to casing comparison, Dujanovich concluded that the seven homicide scene casings were all fired from the same weapon, most probably a Ruger Model 10/.22 rifle.

Dujanovich next compared the misfired cartridge, exhibit 97, found in defendant's home, to each of the homicide scene casings. He opined that all were fired from the same weapon.

Exhibit 102-B, one of the two casings found at the hunting cabin, was then compared to each of the homicide scene casings. Again the conclusion was that all were fired from the same weapon.

Exhibit 102-A, the bent second casing recovered at the hunting cabin, was not as conclusively compared. While it shared "class characteristics" similar to the homicide casings, because of its condition, its individual characteristics could only be positively matched by casing to casing comparison with 2 of the 7 homicide scene casings — exhibit 21 from the Dunn homicide and exhibit 52 from the Green homicide. Dujanovich then opined, however, that since casings 102-A, 21 and 52 were fired from the same weapon, and since 21 and 52 were from the same weapon as the other five homicide scene shells, then casing 102-A and the other five casings must have been discharged from the same weapon. His conclusion was based on the logical proposition that two things equal to the same thing are equal to each other.

Defendant attacks Dujanovich's conclusion arguing that only direct casing to casing comparison is recognized as an acceptable firearms identification technique. This is allegedly shown by Dujanovich's inability to cite an authoritative text, journal article or other publication sanctioning indirect comparison. He thus concludes that the failure to "positively" compare exhibit 102-A with five homicide scene casings, by direct comparison, was evidence favorable to the defendant required to have been disclosed under *Brady v Maryland* (373 US 83).

In *Brady* (*supra*), the Supreme Court held that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment. To be *Brady* material, however, the evidence must be materially exculpatory, i.e., favorable to the accused (see *United States v Agurs,* 427 US 97; *People v Jones,* 44 NY2d 76, cert den 439 US 846; cf., also, *People v Gissendanner,* 48 NY2d 543).

■ Here, defendant's argument is misplaced because Dujanovich did not conclude that cartridge exhibit 102-A was fired from a different gun than the others. Rather, by "inferential analysis methodology", he concluded that they were fired from the same gun. Thus, the only conclusion, if one was to be drawn from this testimony, was that cartridge 102-A was fired from the same gun as the other casings. While this may not have been as conclusively damaging as the direct, positive, casing to casing comparison made with casings 97 and 102-B, since Dujanovich did conclude that 102-A shared the same "class characteristics" as all other casings and all evidence pointed to a lone gunman using the same gun, it was another link tending to show that defendant's gun was used in all three homicides; it was not supportive of defendant's claim of innocence.

■ Defendant's second argument is that he was improperly denied discovery of the laboratory notes forming the basis for the firearms identification report in contravention of CPL 240.20 (subd 1, par [c]). This claim is again tied in with the inferential analysis methodology concerning casing exhibit 102-A in that defendant complains that, had he been granted discovery of such notes, he would have been alerted to this allegedly faulty reasoning process. However, it is clear from Dujanovich's trial testimony that he never committed any of this process to writing and, thus, discovery of his notes would have been of no assistance to defendant. In any event, however, the trial court was correct in ruling that any laboratory notes were more properly characterized as *Rosario* material (*People v Rosario,* 9 NY2d 286) and, thus, not available to defendant through pretrial discovery (*People v Strong,* 60 AD2d 792).

Defendant's third argument, that Robert Perrigo's firearms identification testimony should have been precluded for failure to make his conclusions known during pretrial discovery, is also without merit.

■ Considering that Perrigo's initials appeared on all four laboratory reports, that his name appeared on the witness list and that defendant characterized his testimony in a trial objection as cumulative and merely bolstering of Dujanovich's, we reject defendant's claim that Perrigo's testimony was surprising and unfairly prejudicial (cf. *People v Payne,* 52 NY2d 743). Additionally, since it is clear that the crucial firearms evidence was already properly in evidence through the testimony of Dujanovich and that Perrigo's testimony neither varied from Dujanovich's nor the reports provided, even were we to decide that Perrigo's testimony should have been precluded, any error was harmless (*People v Crimmins,* 36 NY2d 230).

Defendant's fourth contention is that the warrants issued for the search of his home, the shed adjacent to his home and his family's hunting camp were not supported by probable cause, that certain of the items seized were beyond the scope of the warrants, and, further, that the court erred in refusing to hold a hearing on the question of whether the affiant made false and misleading statements in support of the warrant.

The first issue presented is whether there was sufficient probable cause to search the premises. Defendant argues that, since the three search warrants were for three different premises and were obtained upon the same information, there could not have been probable cause to search any single location and that, in any event, the information contained in the warrant application was stale.

■ It is fundamental that probable cause should be determined on the basis of practical, everyday considerations (see, e.g., *United States v Harris,* 403 US 573, 583; *United States v Brinegar,* 338 US 160, 175; *United States v Johnson,* 461 F2d 285, 287). As the People point out, logic suggests that a person who has committed a crime and who wishes to conceal evidence thereof would choose to hide it at a place where he exercises some control; here, defendant's residence and his family's hunting cabin. Moreover,

the narrow question of whether probable cause to search multiple locations can be based upon the same evidence has previously been answered in the affirmative (see, e.g., *People v Alaxanian,* 76 AD2d 187, 189, affd 54 NY2d 725). The Court of Appeals has stated: "The ultimate answer to the [question of probable cause] is that as long as the evidence creates substantial probability that the seizable property will be on the premises when searched, the warrant should be sustained" (*People v Glen,* 30 NY2d 252, 259). A review of the information contained in the affidavit accompanying the warrant application demonstrates that the People met that burden and, hence, defendant's first probable cause argument must be rejected.

The second argument presented under this issue is that the information contained in the warrant application was stale. The Supreme Court has said that proof of probable cause "must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time" (*Sgro v United States,* 287 US 206, 210). However, because the rate at which probable cause becomes stale can vary with the circumstances of the particular case, it is not determined simply by counting the number of days between the occurrence of the events relied upon and the warrant's issuance (*United States v Rahn,* 511 F2d 290; *People v Teribury,* 91 AD2d 815). Rather, this determination rests upon the particular facts and circumstances of each case as presented to the magistrate at the time of the warrant application (*Sgro v United States, supra,* p 211; *People v Nieves,* 36 NY2d 396, 402). Factors to be considered include the source of the information, the manner in which it was acquired, the extent to which the information was verified, and the nature of the crime (*People v Hanlon,* 36 NY2d 549, 559). Additionally, information may be acted upon as long as the practicalities dictate that "[p]robable cause existent in the past [may] continue" (*United States v Brinklow,* 560 F2d 1003, 1005, cert den 434 US 1047; *People v Teribury, supra;* cf. *United States v Johnson, supra*). This assessment "depends largely upon the property's nature" (*United States v Brinklow, supra,* p 1006).

Here, the supporting affidavit made by the Erie County District Attorney on April 22, 1981 contained reliable,

recent information from Captain Burgess and Lieutenant Anderson that on April 10 and April 13, 1981, respectively, defendant admitted killing numerous people in Buffalo and New York City and stated that all the victims were nonwhite males. Furthermore, that the defendant had the ability, opportunity and propensity to commit these acts was also shown in the affidavit which recounted: that David Robinson, Officer Eugene Molino and Geraldine Lysarz knew that defendant owned and was emotionally attached to numerous weapons inherited from his father, including a .22 caliber Ruger 10/.22 rifle and assorted hunting knives; that during his leave defendant traveled through Buffalo and New York City on dates when black males were stabbed by an assailant matching defendant's general description; and that defendant had committed a recent unprovoked attack against a black soldier that was similar in nature to the unprovoked attacks against black males in the Buffalo area. Defendant's admissions and the other facts and circumstances contained in the affidavit freshened the otherwise stale information by David Robinson, a friend of defendant, who told police that he saw defendant with a 10/.22 Ruger rifle a year earlier. It justified the court in concluding defendant's ownership of the Ruger was continuous. Based on the foregoing facts known to the magistrate and the conclusion from a firearms expert that the weapon used in the Buffalo killings was a .22 caliber 10/.22 Ruger rifle, the information was sufficiently fresh and issuance of the warrant proper.

■ The second issue presented regarding the legality of the searches is whether certain items were seized which were beyond the scope of the warrants, specifically a leather hat, various knives and an Army-style rain jacket. The hearing court sustained the seizure of these items on the ground that they were "within the scope and obvious intendment of the warrants and supporting papers" and, in any event, that the items were properly seized pursuant to the "plain view" doctrine due to their readily apparent incriminatory nature (see, e.g., *Coolidge v New Hampshire*, 403 US 443). A review of the warrants and the affidavit submitted in support of the warrant application clearly supports this finding.

The third issue regarding the search contention is whether the court erred in refusing to hold a hearing on the question of whether the affiant had made false and misleading statements used in support of the warrant. Defendant maintains that the affidavit submitted to the issuing magistrate was misleading in that it omitted the following information: that aspects of the description of the perpetrator of the crimes were inconsistent with defendant's physical appearance; and the circumstances surrounding the defendant's statements to the nurses, i.e., that he was a psychiatric patient.

■ Contrary to defendant's position, an applicant for a search warrant is not required to provide the magistrate with all the information in his possession (*United States v Charlton,* 409 F Supp 1327, 1330-1331, affd 565 F2d 86, cert den *sub nom. Jacek v United States,* 434 US 1070). The information omitted from the instant application was, therefore, never required so long as probable cause was demonstrated. Although defendant claims that he made a substantial preliminary showing that the affidavit contained false and misleading statements, the record shows that all he did was point out that there were discrepancies in the descriptions given of the perpetrator of the crimes and that some of the descriptions were unable to be matched to him. The standard for determining whether a defendant is entitled to a hearing on the warrant application was set forth by the Supreme Court in *Franks v Delaware* (438 US 154, 171): "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof * * * Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." The information provided by defendant was patently insufficient to meet this standard and, hence, the court did not err in denying the hearing.

Defendant's fifth contention, that the court erred in failing to suppress certain admissions, is a two-pronged argument: (a) that defendant's statements to Corwin, Burgess, Anderson and Freeman were privileged; and (b) that

defendant's right to counsel and right against self incrimination were violated when Morganstern, a military policeman, was allowed to testify.

Defendant argues that the statements to Corwin, Burgess and Anderson were improperly admitted in violation of New York's physician-patient privilege (CPLR 4504).[8] He claims that the testimony showed that the object of the psychiatric ward is to create a "therapeutic milieu" designed to encourage patient interaction with the staff and get patients to talk about what is on their minds and what is troubling them. Defendant argues that his statements were made during this treatment process.

■ Defendant's argument is clearly misplaced with respect to Specialist Corwin. Since he was a military police officer merely assigned to guard defendant and not a "doctor, dentist, or nurse", nor acting in concert with covered medical personnel, he does not fall within the statute and, thus, statements made to him were not privileged (CPLR 4504).

■ With respect to Captain Burgess, a nurse, to whom the first admission was made during the intake interview, defendant expressed, contemporaneously with that admission, an intention to notify law enforcement officials. Consequently, the hearing court properly found that defendant never intended that the communication remain confidential and thus was not privileged. As this court noted in *Bernstein v Lore* (59 AD2d 650), "[i]n order for the privilege to attach, the communication must have been confidential in nature and the patient must have contemplated that it would be kept so" (see, also, *People v Decina,* 2 NY2d 133; *Milano v State of New York,* 44 Misc 2d 290; Fisch, NY Evidence [2d ed], § 546). Additionally, since defendant's statement to Burgess was an unsolicited gratuitous comment, not a necessary incident to rendering professional service, it was not "information * * * acquired in attending a patient * * * necessary to enable him to act in that

---

**8.** CPLR 4504, entitled "Physician, dentist and nurse", provides under subdivision (a): "Confidential information privileged. Unless the patient waives the privilege, a person authorized to practice medicine, registered professional nursing, licensed practical nursing or dentistry shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity."

capacity" and was thus not privileged (see Fisch, NY Evidence [2d ed], § 546; McCormick, Evidence [2d ed], § 99; cf., also, *Polsky v Union Mut. Stock Life Ins. Co.,* 80 AD2d 777).

 Moving next to defendant's communication to the second nurse, Lieutenant Anderson, a similar analysis is appropriate. At the time of defendant's remarks to Anderson, he had already communicated essentially the same information to both Corwin and Burgess with no expectation that it be kept confidential. Thus the hearing court's conclusion that this statement was not intended to be confidential is supported by the timing and circumstance of the prior admissions. Moreover, because the defendant repeated his admissions, the Court of Appeals reasoning in *People v Al-Kanani* (33 NY2d 260) is applicable here by analogy: "[O]nce the privilege is thus waived, there is nothing left to protect against for once the revelation is made by the patient there is nothing further to disclose 'for when a secret is out it is out for all time and cannot be caught again like a bird and put back in its cage. * * * The legislature did not intend to continue the privilege when there was no reason for its continuance and it would simply be an obstruction to public justice'" (*supra,* p 265, quoting *People v Bloom,* 193 NY 1, 10). In any event, however, by the time that defendant made the statements to Anderson, they were merely cumulative of his earlier nonconfidential, unprivileged remarks and, therefore, if there was error in admitting Anderson's testimony, it was harmless (*People v Crimmins,* 36 NY2d 230, *supra*).

 Defendant also claims that the priest-penitent privilege (CPLR 4505) was violated when Chaplain Freeman was permitted to testify at trial concerning a conversation he had with defendant at Fort Benning. The conversation objected to occurred in the stockade dining hall in January, 1981, during which the defendant stated: that he felt he was being harassed by blacks both in the training brigade and at the stockade; that blacks had directed derisive remarks at him, using terms such as "faggot" and "wimp"; that he was angered and "intensely" depressed by this treatment; that he felt persecuted; and that he had had trouble with blacks during high school. This claim of

privilege would be meritorious but for defendant's express authorization to Chaplain Freeman to reveal the conversation to police or medical officials "to get the help he needed at that time". Chaplain Freeman's unrebutted testimony, apparently found credible by the court, was a sufficient basis for the trial court's ruling that defendant waived the priest-penitent privilege (CPLR 4505).

 Defendant's second argument is that his right to counsel and right against self incrimination were violated when Sergeant Richard Morganstern was allowed to testify at trial concerning a statement made by defendant to Captain Aldrich Johnson in Morganstern's presence (*Rhode Island v Innis*, 446 US 291; *Miranda v Arizona*, 384 US 436). Morganstern testified that on April 26, 1981 the defendant requested to speak with Captain Johnson after having been told that permission to have a musical instrument while confined in the stockade could only be granted by Johnson, the confinement officer. Morganstern contacted Johnson who approached defendant's cell and asked, "Well, what can I do for you, what's up?" The defendant responded, "You know the thing in Buffalo, I did it." Morganstern's uncontradicted version of the circumstances and conversation surrounding defendant's admission amply supports the court's finding that it was a spontaneous, voluntary statement and not the product of interrogation calculated to elicit an incriminating response (*Rhode Island v Innis, supra; People v Rivers,* 56 NY2d 476; *People v Chapple,* 38 NY2d 112). Additionally, because defense counsel was fully apprised before trial that Morganstern was present during the defendant-Johnson conversation, defendant's claim, that he was denied due process of law because Morganstern and not Johnson testified to this admission at trial, is likewise without merit.

Defendant's sixth contention is that the trial court erred in refusing to sever the three second degree murder counts in the indictment. The basis of this contention is defendant's claim that the court abused its discretion in denying his CPL 200.20 (subd 3) motion for severance. CPL 200.20 (subd 3) provides: "In any case where two or more offenses or groups of offenses charged in an indictment are based upon different criminal transactions, and where their joinability rests solely upon the fact that such offenses, or as

the case may be at least one offense of each group, are the same or similar in law, as *prescribed in paragraph (c) of subdivision two,* the court, in the interest of justice and for good cause shown, may, upon application of either a defendant or the people, in its discretion order that any one of such offenses or groups of offenses be tried separately from the other or others, or that two or more thereof be tried together but separately from two or more others thereof." (Emphasis added.)

CPL 200.20 (subd 2) provides:

"Two offenses are 'joinable' when ＊ ＊ ＊

"(b) Even though based upon different criminal transactions, such offenses, or the criminal transactions underlying them, are of such nature that either proof of the first offense would be material and admissible as evidence in chief upon a trial of the second, or proof of the second would be material and admissible as evidence in chief upon a trial of the first; or

"(c) Even though based upon different criminal transactions, and even though not joinable pursuant to paragraph (b), such offenses are defined by the same or similar statutory provisions and consequently are the same or similar in law; or ＊ ＊ ＊".

The People argue that consolidation of the three counts in this case is supported by both paragraphs (b) and (c) of subdivision 2.[9] The significance of this position is that a court is without discretion to grant a severance where joinder is effected pursuant to paragraph (b) (*People v Lane,* 56 NY2d 1, 7; *People v Yuk Bui Yee,* 94 Misc 2d 628). Hence, the threshold question to be addressed is whether "proof of the first offense would be material and admissible as evidence in chief upon a trial of the [others]" (CPL 200.20, subd 2, par [b]).

Here, proof that defendant was the perpetrator of the Glenn Dunn homicide was clearly material and admissible as evidence in the other two homicides. Since the identity of the defendant was established by eyewitness testimony in the Dunn homicide, and because the bullet

---

**9.** While the indictment included a statement to the effect that the alleged offenses charged were similar in law, there is no statutory requirement that any and all grounds for joinder be asserted on the face of the indictment.

casings found at the scene of the Dunn homicide positively correlated with the casings found at the other homicide sites and those found at defendant's home and hunting cabin, the eyewitness identification of defendant as the perpetrator of the Dunn homicide was highly relevant to the identity of the perpetrator of the other homicides. This evidence was also admissible under the identity exception of the *Molineux* rule (*People v Molineux,* 168 NY 264) as it is applied in the joinder context (see *People v Yuk Bui Yee, supra,* pp 631-632).

Defendant's seventh contention is that his convictions under the second and third counts of the indictment were insufficient as a matter of law. On appeal, the People are entitled to the benefit of every reasonable inference to be drawn from the evidence (*People v Way,* 59 NY2d 361), and we must assume that the court credited the prosecution's evidence the full weight that might reasonably be accorded it (*People v Benzinger,* 36 NY2d 29). With these principles of review in mind, it is evident that the evidence presented at trial was legally sufficient to support the convictions.

The following evidence was presented with respect to both the second and third counts of the indictment: the spent shell casings found at the homicide scenes were determined to have been fired from the same gun as spent casings found at defendant's home and hunting camp; defendant's admissions to military personnel that he had killed several black males in Buffalo; and the fact that defendant was known to have possessed a Ruger 10/.22 rifle, the type of weapon used in the homicides. Further, in view of the expert firearms testimony that the same gun was used in all three homicides, the identification of defendant as the killer of Glenn Dunn took on additional probative significance with respect to the second and third counts.

In sum, while the evidence presented is circumstantial in nature, when considered in its entirety, it is sufficient to exclude to a moral certainty every reasonable hypothesis of innocence (*People v Way, supra; People v Benzinger, supra*).

The judgment should be affirmed.

HANCOCK, JR., J. P., CALLAHAN, DOERR and O'DONNELL, JJ., concur.

Judgment unanimously affirmed.