OPINION OF THE COURT
Peter L. Broderick, J.
These 21 indicted coconspirators are charged with various crimes relating to an alleged cocaine trafficking conspiracy. They have made a number of motions regarding the propriety and sufficiency of the indictment.
Previously, this court issued two decisions addressing a portion of these motions. The first dealt with claims advanced by the defense that the prosecutor had failed to sufficiently respond to various demands for discovery and a bill of particulars. That decision identified such demands as this court felt to be inadequately addressed and directed the prosecutor to make additional disclosures.
The second decision addressed the various arguments made against the sufficiency of the grand jury presentation. That de *169 cisión upheld the indictment, as drawn, with respect to all but two of the codefendants. The charge against those two (Kilmer and Lavigueur) was reduced to the class B misdemeanor of sixth degree conspiracy.
This third decision now addresses the remaining issues raised by the defendants in their pretrial motions. Notably, such issues include jurisdiction claims (no proof of multicounty activity; no advanced written authority and request from the Governor and the local district attorney; lack of authority for Organized Crime Task Force [OCTF] to seek pen registers, wiretaps or search warrants), wiretap matters (including exhaustion, staleness, achievement of goals obviating need for extensions, a request for a Franks IAl finito hearing, and the contention that proper sealing requirements were ignored), the request for a James/ Evangelista hearing, and a motion seeking severances for three of the defendants (Ron Graci, King and Misteri).
Jurisdiction Issues:
A. No Multicounty Activity. The first jurisdiction issue to be addressed is the defendant’s claim that there is no evidence of any conspiratorial activity in any county other than Niagara, thus the multicounty predicate described in Executive Law § 70-a (1) (a) has not been met, OCTF lacked jurisdiction ab initio, and the resultant indictment must be dismissed. (See 534/000058-000056, 534-16/000058.) This contention is rejected and the motion to dismiss, based thereon, is denied.
The prosecution does, indeed, possess evidence of criminal conspiratorial conduct having been committed on Grand Island, in Erie County. Some of that evidence was presented before the grand jury. Such evidence consists of testimony concerning telephone calls to and from Grand Island with at least seven customers (Burns, DiNunzio, Ouellette, Gorbach, Schultz, Bidak and Desimone) seeking to obtain cocaine and who actually did obtain cocaine from this ring (Ron Graci). (See, 534BINDER/ 000023, 000503, 000955, 000956, 000967, 000972, 000978, 000986, 001002, 001004, 001005, 001008, 001011, 001013, 001016, 001032, 001040, 001045, 001046, 001052, 001053, 001055, 001065, 001066, 001078, 001095, 001101, 001116, 001117, 001131, 001137.) There is no legal requirement that any of the Erie County activity actually be included in an enumerated overt act set forth inside the accusatory instrument. (See, People v Blase, 112 AD2d 943, 945 [2d Dept 1985].)
B. Failure to Mention Every Defendant in at Least One Overt Act. The defense raises the claim that the indictment must be *170 dismissed against any defendant who is not specifically mentioned in the activity of at least one of the enumerated overt acts set forth in the indictment. (See, 534-16/000057-56.) This is incorrect.
Once a defendant is shown to have been a member of the conspiracy, all overt acts performed by any of the coconspirators becomes the legal act of every other conspirator. The prosecution must merely plead at least one (but can plead as many as they wish) of the overt acts in the indictment; may offer proof as to as many overt acts as they wish at trial, regardless of whether they were pleaded in the indictment; and must prove at trial beyond a reasonable doubt at least one of the pleaded overt acts contained in the indictment in order to sustain a conviction.
C. Failure to Obtain Advance Authority. The most significant jurisdiction issue raised by the defense here is their claim that the OCTF failed to obtain advanced written authorization from the Governor and the local district attorney prior to participating in this investigation. It is their claim, citing Matter of B.T. Prods, v Barr (44 NY2d 226 [1978]), that such approval is required and that in its absence all investigative results participated in by the OCTF — and every lead flowing therefrom — must be suppressed. (See, 534/000058, 534-9/000130.) Part and parcel of the defense contention here is their corollary claim that the OCTF has no power to apply for pen registers, eavesdrop orders or search warrants.
Although arriving at the result is a more complex journey, these contentions are likewise erroneous and the motion to dismiss and suppress is denied.
The Organized Crime Task Force is a creature of statute and all powers it possesses must be legislatively granted to it, expressly or by clear implication. In the late 1960’s, the Legislature determined that organized criminal activity was a serious public threat in New York, one that the traditional county bound district attorney prosecutorial system was ill suited to address:
“Hundreds of local law enforcement agencies throughout the state, as well as the sixty-two district attorneys of the state, are empowered to investigate and prosecute organized crime cases, but the ability of these agencies and prosecutors to successfully deal with a broad-based organized crime enterprise is severely hampered because of their limited re *171 sources and restricted geographical jurisdiction; this overly fragmented, uncoordinated approach is not the most effective method for curtailing the activities of organized crime and minimizing its danger to the peace, security and general welfare of the people of the state.” (See, Legis Mem, Bill Jacket, L 1970, ch 1003.)
The Superintendent of the New York State Police, in his recommendation to the Legislature dated April 29, 1970 (likewise contained in Bill Jacket, L 1970, ch 1003), expressed the only articulated opposition to the creation of the OCTF even as he dismissed the concern and recommended approval of the bill:
“The archaic institution of law enforcement by counties and the completely parochial authority of district attorneys prevent effective prosecution of many wide-spread criminal operations and conspiracies — coming immediately to mind are gambling, narcotics operations and stolen car rings . . . The basic objections to such bill have to be objections of self-interest on the part of district attorneys and their associates who may see a chance for glory hereby put in the hands of another or the means to protect a friend hereby removed from them.”
Governor Rockefeller’s memorandum filed with the corresponding Senate bill describes the intended powers and duties of the OCTF:
“The Attorney General’s power with respect to serious crimes has been limited in the past to an investigatory function under section 63 of the Executive Law. Primary responsibility for prosecution has rested with the district attorneys of the State. Only where a district attorney has been unable to act without fear or favor has it been appropriate for the Attorney General to assume responsibility for prosecution of such crimes pursuant to the superseder provisions of section 63.
“This bill establishes for the first time a permanent unit within the Office of the Attorney General that will have both the power to investigate and prosecute organized crime.
“In contrast with existing authority, the deputy attorney general in charge of the task force will not be restricted to ad hoc activities in place of the district attorneys under the limited conditions *172 provided in section 63. Instead, a close working relationship between the statewide prosecutor and local law enforcement officials will be developed to coordinate the State’s efforts to combat organized crime.
“The task force will have the authority to investigate and prosecute organized crime activities, including such offenses as gambling, trafficking in dangerous drugs, hijacking, labor racketeering, bookmaking, extortion and bribery, that cross county lines.
“The task force will also have the duty and power to cooperate with and assist local law enforcement officials in organized crime cases . . .
“The State cannot afford to ignore any avenue for rooting out criminal combines that seek to corrupt public office holders, invade legitimate businesses, thrive on the sale of narcotics, loansharking, extortion and gambling and often boast openly of immunity from the reach of the law. . .
“In approving this important measure, I am pleased to report that the bill has received the strong endorsement of the District Attorneys Association, the State Commission of Investigation, the National Council on Crime and Delinquency, the Crime Control Planning Board and the Honorable Frank B. Hogan, District Attorney of New York County.” (1970 McKinney’s Session Laws of NY, at 3142-3143.)
Thus, with nearly unanimous approval, the statute was passed and the OCTF was created on May 20, 1970. The statute, as it existed at that time, created a general rule, four exceptions to that rule that further expanded the powers of the OCTF, and two exceptions to that rule that — while they likewise further expanded the powers of the OCTF — also imposed some caveats or conditions to appease local district attorneys.
The general rule, found in Executive Law § 70-a (1) (a) and (b), gave the OCTF the “duty and power:
“(a) To conduct investigations and prosecutions of organized crime activities carried on either between two or more counties of this state or between this state and another jurisdiction; [and]
“(b) To cooperate with and assist district attorneys and other local law enforcement officials in their efforts against organized crime.”
This general grant of authority was very broad, encompassing *173 all of the investigative and prosecutorial powers known to the local authorities. It contained no further restrictions or preconditions but for the two expressed therein, namely, multijurisdiction and organized criminal activity.
Subdivisions (2) through (5) contained the four exceptions, granting to the OCTF greater investigative powers than possessed even by the local agencies. Subdivision (2) conveyed the ability to the Governor and the Attorney General to appoint, assign, remove and compensate OCTF members without regard to the normal rules of civil service. This was a power greater than that possessed by the local agencies.
Subdivision (3) empowered the OCTF to seek, and compelled the agencies to grant, special cooperation and assistance from all state agencies and their subdivisions. This, too, was a power greater than that possessed by the local agencies.
Subdivision (4) authorized the OCTF to conduct office hearings, complete with the ability to require testimony under oath, to issue office subpoenas, to compel attendance and examination, and to require the production of subpoenaed records and materials, all as OCTF deemed relevant or material to their investigation. Failure to obey such office subpoenas was made an independent crime. These were powers far beyond anything possessed by the local agencies, ones that such agencies had long coveted, but had been consistently denied.
Subdivision (5) granted the OCTF, upon application to Supreme Court and receipt of an order, the ability to impound and retain any exhibit marked into evidence during one of their office subpoena inquiries described in subdivision (4). Such impounded materials would remain in the custody of the OCTF. This, too, was a power transcending that possessed by the local authorities.
Subdivisions (6) and (7) further expanded the powers given to the OCTF, but with attending caveats designed to appease the local district attorneys and minimize potential turf wars with the local authorities. Subdivision (6) gave the OCTF the authority to confer immunity upon any witness during their office subpoena hearings under subdivision (4) — provided they first notified the local district attorney and afforded that officer the opportunity to object. Subdivision (7) gave the OCTF authority to actually prosecute (not just investigate) organized criminal activity — provided they first obtained the approval of the Governor and the approval or request of the appropriate local district attorney. Once having obtained these two permissions, *174 the OCTF was empowered to actually present evidence before a local grand jury, seek indictments, and conduct all courtroom matters attending the prosecution of any such resulting accusatory instruments, exactly to the same degree as the local district attorneys were empowered to do.
This, then, was the 1970 statute. It was clearly contemplated by the Legislature as just described. Nowhere is written approval or request mandated. Nowhere is approval prior to investigation mandated. Investigation of multijurisdiction organized criminal activity is made an affirmative duty of this new agency. Advanced approval was mandated prior to participating in any grand jury activity or any courtroom activity prosecuting an accusatory instrument. Thus was the statute intended; thus did all interpret the statute; and thus was the statute applied in countless investigations throughout the state from 1970 to 1978.
Then came B.T. Prods., Judge Gabrielli, writing for a six-to-one majority consisting of Chief Judge Breitel and Judges Jones, Wachtler, Fuchsberg, Cooke and Gabrielli (with only Judge Jasen in dissent), held that Executive Law § 70-a did not give the OCTF authority to apply for, obtain or execute a search warrant in the absence of prior authorization by the Governor and local district attorney. In essence, the Court ruled that what the Legislature really meant by Executive Law § 70-a (despite its clear and contrary language) was that the advance approval mentioned only in subdivision (7) (as a precondition to grand jury presentment and courtroom prosecution of the resulting indictment) actually applied to all of the activities of the OCTF not expressly itemized in subdivision (4). This ruling shocked the legal community, stunned the Legislature and hamstrung the OCTF and local law enforcement agencies in their unified war against organized criminal activity across the state.
To understand why the Court of Appeals reached this radical result requires appreciation of the facts in the B.T. Prods, case. A review of the records suggests that the OCTF had, in that case, abused its vast grant of power. They applied to an independent court and obtained a search warrant requiring a private business, B.T. Productions, Inc., to produce the vast bulk of all their business records for the previous two years. Never were they told the reason for the seizure. Never were the records returned to them or made available to them. Never was any criminal charge brought against them, or — apparently—even seriously contemplated. Despite repeated efforts to obtain access to needed records in order to conduct their business, and *175 crushed by the weight of the adverse publicity attending the nebulous insinuations of organized criminal connections accompanying the search warrant seizures, B.T. Productions was unable to obtain effective relief. In desperation, finally, their attorneys sought a writ of prohibition from the Appellate Division seeking to prevent the OCTF from retaining the business records. The Fourth Department, aghast at the blatant abuse of power evidenced by this charade, granted the writ. The matter was stayed pending appeal to the Court of Appeals. Even though, ultimately, B.T. Productions won their case and obtained the order to return the records by the Court of Appeals decision, the passage of time under the cloud previously mentioned was too great. The business went bankrupt.
A civil suit was then commenced on behalf of Anthony Della Pietra and B.T. Productions, Inc., seeking damages from the OCTF and New York State for the tortious interference with their business resulting in the bankruptcy. (Della Pietra v State of New York, 125 AD2d 936 [4th Dept 1986].) There we learn more valuable facts behind the earlier ruling in B.T. Prods. It seems that Anthony Della Pietra and Barry Tuttle were equal partners in B.T. Productions. They began feuding. When Della Pietra sought to buy out Tuttle’s share, Tuttle went to the OCTF for assistance. He alleged that the business was engaged in organized crime. This prompted the task force to seek and obtain the search warrant that was the gravamen of the B.T. Prods, ruling. The OCTF conducted a “generalized investigation with no particular focus,” rather than a specific investigation of potential organized criminal activity. (See, Agresta v Roberts, 66 AD2d 929, 930 [3d Dept 1978].)
In short, B.T. Prods, was a poorly reasoned opinion motivated by the laudable desire to right a perceived wrong caused by the overreaching of the young OCTF.[1] Rarely does good law arise from bad cases. But good law or bad, the ruling is from the *176 Court of Appeals (albeit with a completely different cast of judges from the bench today) and, if still good law, obviously binds this court. That is the very essence of the rule of law and judicial restraint.
The case is no longer good law. It has been abrogated by subsequent statutory amendment.[2] In essence, the Legislature moved rapidly to overrule this erroneous decision by amending Executive Law § 70-a. That amendment, and the firestorm of comment found in the Bill Jacket attending that legislation, evidences the utter disagreement with the Court of Appeals’ interpretation of both the legislative intent behind, and the plain meaning of, the original statutory language creating the OCTE
Recognizing the aforementioned abuse of power, the Attorney General and Governor made a change in the director of the OCTE, naming Ronald Goldstock the new head of that agency. Mr. Goldstock represented a new breed of young, intelligent, extremely vigorous, but scrupulously honest prosecutors. He would prove to be a most provident appointment.
Once that change was effected, the Legislature took up the issue in 1982 and rapidly moved to correct the Court of Appeals’ mistake. As the new director’s supportive letter to the Legislature (Bill Jacket, L 1982, ch 667, dated Feb. 8, 1982) indicates:
“The need for this bill was created by the decision of the Court of Appeals in B.T. Productions v. Barr, 44 N.Y.2d 226, 405 N.Y.S.2d 9 (1978). In that case, a state police officer assigned to OCTE applied for a search warrant in connection with an OCTE investigation. As you know, state police officers are proper applicants for search warrants pursuant to CPL Section 690.05. However, the Court of Appeals held that *177 because OCTF had not first secured the consent of the governor and local district attorney to institute a later prosecution, OCTF was not itself authorized to apply for the warrant. On the ground, the Court suppressed the evidence seized.
“The unanticipated result in that case frustrated the intent of Executive Law Section 70-a, which empowers the organized crime task force both to investigate and prosecute multi-county organized crime activity, and conditions only the power to prosecute on the consent of the governor and an appropriate district attorney. During a criminal investigation, and long before the institution of any criminal prosecution, it is frequently necessary to secure evidence by means of court order. Such investigative orders, including eavesdropping warrants, search warrants, and orders directing the installation of a pen register or prohibiting the disclosure of an investigative subpoena, are vital tools for any law enforcement agency conducting sophisticated investigations. As the task force may investigate without securing consent to a later prosecution, it is logical and appropriate that it also be authorized to use court orders in those investigations without such consent . . .
“This bill would solve these practical and legal problems by giving the task force unconditional authority to secure evidence by court order. It does not alter, of course, the requirement that the task force procure consent from the governor and district attorney to institute a prosecution. Nor does it give the task force extraordinary powers. With respect to search warrants, for example, the bill would do no more than return to police officers assigned to (or working in conjunction with) OCTF the statutory authority they had prior to B.T. Productions.
“The reach of B.T. Productions, however, extends to other kinds of investigative court orders as well. Accordingly the amendment is not limited to search warrants. Agencies like the task force — creatures of unique statutes or regulations — are all too frequently subjected to endless litigation on the limitations of their jurisdiction and authority. Rather than permit the B.T. Productions issue to arise repeatedly in the context of other kinds of court orders, *178 this bill would clarify the authority of the task force and permit it to carry out its intended work.
“What sorts of court orders will be sought under the legislation will, of course, depend on the exigencies of the investigations the task force undertakes. Pursuant to CPL Section 700.05, the Deputy Attorney General in charge of the Task Force, when so authorized by the Attorney General, may already apply for an eavesdropping warrant without first securing consent from the Governor and district attorney. Other, less obtrusive, kinds of orders may also be required in a particular investigation. This bill does not create new kinds of investigative orders, nor lessen in any way the standard of proof necessary to secure them. It merely permits the task force to apply for existing types of orders, upon the necessary factual showing, thereby enabling the task force to carry out its statutory mandate to investigate multi-county organized crime activities.”
The legislative memorandum for this amendment characterizes it as: “an act to amend the executive law, in relation to the authority of the deputy attorney general in charge of the organized crime task force to apply for, obtain and execute search warrants and eavesdropping warrants.” The same memorandum goes on to state the purpose of the amendment: “In B.T. Productions, Inc. v Barr, 44 N.Y.2d 226, 405, 405 N.Y.S.2d 9 (1978), the Court of Appeals held that a State police officer assigned to the Organized Crime Task Force was without authority to apply for a search warrant because the Task Force itself had no authority to do so, absent the consent of the Governor and an appropriate district attorney to institute a criminal prosecution. This amendment would legislatively overrule that decision by explicitly providing that among the investigative powers of the Deputy Attorney General in Charge of Organized Crime Task Force is the power to apply for, obtain and execute search warrants and eavesdropping warrants.” (Bill Jacket, L 1982, ch 667.)
Once again, as with the original statute, the amendment was unanimous in its passage. The only real reference to an objection was voiced in the June 7, 1982 letter of Attorney General Robert Abrams (contained in Bill Jacket, L 1982, ch 667) wherein he indicates that “Bob Morgenthau, President of the District Attorneys Association, has advised that the Association opposes this measure on grounds that it might cause duplication or embarrassment to local district attorneys and OCTF.”
*179 In his memorandum for the Governor (contained in Bill Jacket, L 1982, ch 667), the Attorney General points out:
“Until 1978, OCTF acted on the unchallenged assumption that only the power to prosecute required the consent of the governor and an appropriate district attorney. In many criminal investigations, and long before the institution of prosecutions, OCTF frequently secured evidence by means of court order.
“In fact, the legislature, in a related area, clearly authorized the Task Force to conduct court-ordered seizures of evidence prior to securing consent. In 1972, it made the Deputy Attorney General in Charge of the Task Force an authorized applicant for eavesdropping warrants. At the same time, and specifically on behalf of the Task Force, the Legislature amended Section 700.10 of the CPL to permit an applicant to apply for an eavesdropping warrant if he has authority to prosecute the designated offense, or even if his authority is limited to the investigation of the designated offense.
“The Court of Appeals holding in B.T. Productions has raised a myriad of practical and legal problems— especially since the Task Force’s own investigators also have police officer status. Based on B.T. Productions, one court has held ineffective the cross-designation of an assistant attorney general in the Task Force as a special assistant district attorney. B.T. Productions also jeopardizes the admissibility of contraband legitimately seized by the Task Force without a warrant in exigent circumstances. It even puts into question the use a district attorney may make of evidence gathered during a Task Force investigation, since a court may later conclude that the district attorney was acting solely as an agent of the Task Force. This bill remedies these problems.”
Upon this backdrop, the Legislature amended Executive Law § 70-a in 1982, changing subdivision (4) to read:
“4. The deputy attorney general in charge of the organized crime task force is empowered to secure evidence by means of court order, to conduct hearings at any place within the state, to administer oaths or affirmations, subpoena witnesses, compel their attendance, examine them under oath or affirmation, and require the production of any books, re *180 cords, documents or other evidence he may deem relevant or material to an investigation. He is empowered to apply for search warrants pursuant to article six hundred ninety of this chapter, and, except in exigent circumstances, shall give prior notice of the application to the district attorney of the county in which such a warrant is to be executed, and in such circumstances, shall give such notice as soon thereafter as practicable; provided, however, that the failure to give notice of a search warrant application to a district attorney shall not be a ground to suppress the evidence seized in executing the warrant. He may designate an assistant to exercise any such powers. Every witness attending before such deputy attorney general or his assistant shall be examined privately and the particulars of such examination shall not be made public. If a person subpoenaed to attend upon such inquiry fails to obey the command of a subpoena without reasonable cause, or if a person in attendance upon such inquiry shall, without reasonable cause, refuse to be sworn or to be examined or to answer a question or to produce a book or paper, when ordered so to do by the officer conducting such inquiry, he shall be guilty of a class A misdemeanor.” (Changes are underlined.)[3]
The very next year (1983) the Legislature further amended Executive Law § 70-a. At that time they struck the language “to secure evidence by means of court order” and corrected inaccurate references to the provisions of law authorizing the application for search warrants. At first blush, this deletion of the first phrase might be interpreted as an indication that such authority was being withheld from the OCTE A reading of the legislative history, however, makes it clear that the exact opposite is the case — the language was removed because the Legislature considered it to be unnecessary, since the OCTF was already legislatively empowered to apply for eavesdropping warrants under article 700 of the CPL. As the legislative memorandum (Bill Jacket, L 1983, ch 221) for this 1983 amendment indicates: “This bill amends Executive Law, § 70-a, subd 4, to: a) clarify an inaccurate reference contained in the subdivision, and b) eliminate a redundant reference.” “purpose: This bill *181 will modify several minor deficiencies occasioned by inartful drafting in L. 1982, ch 667.” “Moreover, L. 1982, ch 667 also contained language (‘to secure evidence by means of a court order’) which is unnecessary since the same chapter specifically authorized the Deputy Attorney General in Charge of the Organized Crime Task Force to apply for search warrants. Authorization for the Deputy Attorney General in Charge to seek eavesdropping warrants was previously established by amendments to Criminal Procedure Law, Articles 700.05 and 700.10 (L. 1972, ch 586).” “This bill will eliminate unneeded language while not changing in any way the substantive rights and responsibilities of the Deputy Attorney General in Charge of the Organized Crime Task Force.” (Also cf., People v Vespucci, 144 AD2d 48 [2d Dept 1988], affd 75 NY2d 434 [1990], distinguished on other grounds in People v Fonville, 247 AD2d 115 [4th Dept 1998].)
This amendment (the last amendment in the 33-year history of Executive Law § 70-a) was likewise passed, giving us the language of the statute as it exists today.
Based upon the foregoing, the defendants’ motion to dismiss, and to suppress, based upon “failure” of the OCTF to obtain advance written gubernatorial and district attorney approval prior to applying for their pen registers, eavesdrop warrants and search warrants under B.T. Prods, is denied. Provided the OCTF can demonstrate (as they have in this case) that the matter involves multicounty or interstate organized criminal activity or that the local law enforcement officials have requested OCTF cooperation in their efforts against organized crime (as they also did in this case), they have full statutory powers to investigate under Executive Law § 70-a (1). This includes the ability to apply for, obtain, and execute trap and trace devices,[4] pen registers,[5] eavesdrop warrants,[6] and search warrants.[7] No prior written approval of the Governor or local district attorney is mandated for the exercise of these investigatory functions. In the exercise of its prosecutorial functions, advance approval of the Governor and advance request of the district attorney (whether demonstrated by a writing or otherwise) are required before the OCTF may present matters *182 before a grand jury or prosecute any resultant accusatory instruments before a court under Executive Law § 70-a (7).
Wiretap Issues:
A. Exhaustion. The first wiretap issue to be addressed is the defendants’ claim that there was no proper showing of the exhaustion of normal investigative efforts prior to applying for the eavesdrop warrants. (See 534/000070.) They are mistaken.
The present case is unlike the eavesdropping warrants condemned by the Courts in People v Candella (171 AD2d 329, 332 [4th Dept 1991] [police investigation was only two months old and effort expended by police minimal at time of application; there was no indication or assertion that the prime target acted in an evasive manner or refused to deal directly; and, in fact, the police had made a direct informant buy from the prime target]), People v Fonville (247 AD2d 115, 121-122 [4th Dept 1998] [the application averments were false boilerplate from unrelated cases alleging facts that simply did not exist in the current case, the applicant offered misrepresentations and concealed facts showing that other investigative techniques had been successfully used, the application was made in the infancy of the investigation — just five days after first starting to investigate the target, and even in that brief period the prime target actually took the police informant into his confidence and offered to trade cocaine for cellular telephones — which was tape-recorded by the police]), People v Likely (166 AD2d 872, 873 [4th Dept 1990] [police falsely claimed that surveillance was ineffective due to the residential character of the target’s neighborhood — when actually the police had successfully conducted effective surveillance in the case belying that claim]), United States v Lilia (699 F2d 99,104-105 [2d Cir 1983] [trooper was able to actually make a buy — through an informant — from the prime target, that prime target was not apprehensive about dealing with the trooper, the application never revealed what — if any — investigative techniques were even attempted prior to the wiretap request, nor did the application specify any facts upon which it based the conclusion that “no other investigative method exists to determine the identity” of criminal participants, and the State relied on wiretapping as a substitute for standard investigative procedures]), or People v Viscomi (113 AD2d 76, 77 [4th Dept 1985] [the application revealed no investigative efforts that may have been tried or contemplated, and the use of the wiretap was “merely a useful additional tool” — but not one demonstrated to have been necessary]).
*183 Section 700.15 (4) of the CPL requires the applicant to make a showing that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ.
Neither New York nor federal law requires that any particular investigative procedure be exhausted before wiretapping may be authorized. (Lilia, supra.) This requirement is designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. Such traditional techniques need not be exhausted first if they are impractical, too dangerous, or costly and inconvenient. The objective is to ensure that wiretapping is not routinely employed as the initial step in a criminal investigation; neither, however, need it be the absolute last resort.[8] This is accomplished by requiring the applicant to state, and the court to find, that normal investigative procedures have been tried and failed, or at least considered and reasonably determined to be unlikely to succeed if tried or too dangerous to employ. (Lilia, supra at 102-103.)
The present application submitted seeking the first wiretap order in this case was dated August 29, 2002 (534BINDER/ 001504). Submitted by Deputy Attorney General in Charge George B. Quinlan, that application included the 14-page affidavit of Assistant Deputy Attorney General Patricia Carrington and the 16-page affidavit of OCTF Investigator Ronald B. Vincent (534BINDER/001501 — 001472). These affidavits tender one of the more capable and complete synopses of investigative efforts this court has ever witnessed in a wiretap application in over 30 years dealing in the criminal justice system (as a district attorney, a criminal defense attorney, and a judge). The issuing magistrate was fully and truthfully informed about the considerable efforts already made in this two-year-old investigation emanating from the Niagara Falls Police Department Narcotics Intelligence Unit. Through a variety of street sources, the police had been able to identify Ronald Graci as their prime target, the suspected ringleader of a cocaine distribution operation in Niagara Falls and Grand Island. He was noted, however, to be very wary of law enforcement, having refused to sell to persons he once regularly dealt with, after they became known to the *184 police as narcotics users.[9] Various particulars disclosed in the application make quite reasonable the police concern that Graci had an inside source within the police department providing him with such tips.
The normal investigative techniques already employed, and described in the application, included the use of a confidential informant (CI-1). The police quietly took down this individual after having made a suspected purchase from Graci. CI-1 gave the authorities significant information regarding Graci’s narcotics activity and agreed to make a controlled purchase from him, but Graci thereafter refused without explanation to deal any further with CI-1. This both exacerbated police concerns that Graci had an inside source at the department (since CI-1 had never been formally arrested or booked) and rendered CI-1 useless for active assistance in the investigation.
Debriefing of CI-1 produced a second confidential informant. Even though not able to purchase directly from Graci, this second informant (CI-2) was able to purchase from Ciccarelli and Bugyi. CI-2 was also able to introduce an undercover police officer to these two barmaids and, ultimately, the officer was able to independently make buys from both barmaids, thus preserving CI-2’s anonymity. While these police buys implicated Graci’s involvement, they never amounted to usable proof sufficient to arrest or convict Graci. Thus, the use of both confidential informants and undercover police operatives proved unsuccessful in securing appropriate evidence against the prime target (Ronald Graci), let alone in “climbing the ladder” to identify and arrest Graci’s sources.
Surveillance, too, was extensively utilized in this police investigation prior to the application for an eavesdrop warrant. While some problems did occur (and surveillances had to be terminated) because known associates of Graci spotted the teams, much of the surveillance work was helpful. Though helpful, it also proved insufficient to garner enough evidence to arrest or convict the prime target.
The use of these traditional investigatory techniques did, however, give the police massive indication that Graci and his lieutenants made extensive use of telephones and pagers in conducting their narcotics business. This, combined with the stalemate reached by use of conventional techniques, caused the *185 investigators to seek and obtain a pen register and trap and trace order on July 11, 2002. The first such order covered Bugyi’s cell phone. That led to another order to cover Ronald Graci’s cell phone; then a third to encompass Julie Graci’s cell phone. These pens, coupled with the use of the undercover officer and surveillance teams, yielded nine additional buys, but failed to enable the teams to purchase directly from the prime target. Of course, the pens were of inherently limited usefulness, since they could not reveal who utilized the telephones or what was actually said in the calls.
The only way remaining to reach the prime target and, hopefully, to identify his sources of cocaine, was through the use of electronic eavesdrops. That application was finally made on August 29, 2002, resulting in a thorough review by Justice Jerome C. Gorski. He found sufficient factual and legal basis for the issuance of an eavesdrop warrant, which he signed on August 30, 2002.
The affidavits submitted in support of the original warrant depicted a fairly sophisticated drug trafficking operation about which the investigators had learned significant but limited information using other investigative procedures. The informants and undercover officer the investigators had used could not infiltrate the organization and physical surveillance would not secure the evidence necessary to identify and convict all of the conspirators and seize the drugs and proceeds. As in People v Giraldo (270 AD2d 97 [1st Dept 2000]), the application for an eavesdrop warrant in this case was appropriate. To satisfy the requirements for issuance of an eavesdropping warrant, the applicant need not make a showing that every conceivable method of investigation has been tried and failed (although most such methods were, in fact, utilized here). Rather, the requirements are satisfied by establishing the nature and progress of the investigation and the difficulties inherent in the use of normal law enforcement methods in order to attain the ultimate investigative objectives. (People v Brown, 233 AD2d 764 [3d Dept 1996]; also cf., People v Spano, 170 AD2d 996 [4th Dept 1991].) These were not generalized and conclusory statements that other investigative procedures would prove unsuccessful, but rather lengthy and detailed renditions of precisely what procedures were tried without ultimate success. (Cf., United States v Rivera, 198 FRD 48, 50 [WD NY 1999].) Tested in the required practical and commonsense fashion, in the context of the objectives of the investigation, this application was legally *186 sufficient. (People v Hafner, 152 AD2d 961 [4th Dept 1989]; People v Campagni, 151 AD2d 1010 [4th Dept 1989]; People v Baris, 116 AD2d 174, 186-187 [4th Dept 1986].)
In this respect, the current application is legally similar to those sustained in the following cases: People v Cannizzaro (167 AD2d 871 [4th Dept 1990]), People v Domingo (161 AD2d 1162 [4th Dept 1990]), People v Bachiller (159 AD2d 955 [4th Dept 1990]), People v Gallina (95 AD2d 336, 339-340 [2d Dept 1983]) and People v Versace (73 AD2d 304, 307 [2d Dept 1980]).
The motion to controvert the eavesdrop warrant upon this ground is denied.
B. Staleness. The defense contends that the eavesdrop application lacked probable cause because the information alleged was “stale.” The contention is that the last buy was made on August 7, 2002, but the warrant was not sought until August 30, 2002, some three weeks later. (534/000065.) In support of this claim, the defense quotes People v Candella (supra at 332): “The evidence of a single sale of cocaine to an informant in June 1989 was not refreshed by information about continued drug activity occurring between the sale and the application for the eavesdropping warrant,” as though that meant such a sale could not be refreshed by such subsequent information concerning continued drug activity.
This is misleading and utterly misapplies the Candella case. First, Candella does not bear resemblance to the present matter at all. In Candella, the eavesdrop was sought based upon only a single buy. This case involves far more investigative effort than that. In addition, Candella, when properly read, held that unless there was more evidence presented of continuing drug activity from the June 1989 buy to the mid-August 1989 eavesdrop warrant (perhaps as long as 2½ months), that one buy was stale and insufficient to give probable cause to believe that the telephone would yield drug information.
Here, of course, there was a demonstrated pattern of continuing drug activity for more than two years. Surveillances were conducted at least from March 2002 up until August 29, 2002. A pen register had been operational from July 11, 2002, with a new order signed as late as July 31, 2002. The information continuing to come in through that source suggested the unabated telephonic activity circumstantially supportive of the continuation of the narcotics operation. As People v Baris (116 AD2d 174, 184 [4th Dept 1986]) indicates, otherwise stale information may be revived and acted upon as long as the practicali *187 ties dictate that probable cause existent in the past may continue into the present.
The information presented to Justice Gorski, considered as a whole, was not stale and did provide probable cause sufficient to sustain the issuance of the eavesdropping warrant. The defendants’ motion to controvert the warrant on this basis is denied.
Goals Achieved, Thus No Need For Extensions. The defendants argue that even if the initial eavesdrop warrant was appropriate, the fruits of that eavesdrop obtained enough legal evidence after just two weeks to fully achieve all investigatory goals and successfully convict all of these defendants. (534/ 000062.) This is not true.
One of the stated investigatory goals in this case (as it properly should be in all narcotics conspiracies) was “identifying the suppliers ... of the narcotics being distributed by the subjects’ organization.” (534BINDER/001499.) This concept of “climbing the ladder” to try and discover, and bring to justice, the ultimate source or sources of Ronald Graci’s cocaine was a central objective. The progression of eavesdropping warrants in this case clearly indicates the police efforts to accomplish that specific end.
The first wiretap order, entered on August 30, 2002, was able to identify only the Bugyi cell phone and the Graci pager. (534BINDER/001507.) That order was amended and enlarged by Justice Gorski on September 24, 2002 (534BINDER/001471), adding additional identified coconspirators Ciccarelli, Julie Graci, Bidak, Stewart and Keith Clark. None of these individuals were a source of Ronald Graci’s cocaine. A third extension and amendment, signed by Justice Gorski on October 1, 2002 (534BINDER/001427), for the first time adds the names of King and Trane — and clearly indicates that while King was a source of some of Ronald Graci’s cocaine, he was not believed to be the primary source. The investigators’ reasons for that supposition were carefully laid out in the application. Because the primary investigative objective had not yet been attained (i.e., identifying the primary source), the wiretaps properly continued.
On October 25, 2002, a further amendment was signed by Justice Gorski (534BINDER/001385) to add the name of Misteri, who the authorities now believed to be the primary source of Graci’s cocaine. In order to verify that belief, as well as to determine whether it would be possible to ascertain Misteri’s source of supply, the wiretap was properly continued.
*188 On October 31, 2002, the last extension and amendment was signed by Justice Gorski (534BINDER/001343) to add the name of Walters. That application makes it clear that the six days from the preceding amendment had proven insufficient time to obtain the additional evidence concerning Misteri’s source of supply. Additional time to ascertain whether the wiretap would yield such information was requested. Justice Gorski gave the investigators until November 29, 2002. Even though the information submitted to this court does not indicate when the final wiretap was actually terminated, it is clear that the investigation never was able to determine Misteri’s source of supply (since the indictment extends no farther up the ladder than Misteri). Apparently the investigators determined that no further information of value would be forthcoming from wiretaps and, therefore, concluded their use and proceeded with their prosecution even though the ladder extended higher than they had been able to climb.
All of this sufficiently demonstrates that at no point during the life of these wiretaps had the primary investigative objective been attained. The defendants’ motion to controvert the wiretaps, suppress their fruits and dismiss the indictment upon the ground that they had extended past the full attainment of all stated investigatory goals is, thus, denied.
Request For A Franks/Alfinito Hearing. The defense contends that this court must conduct a hearing to explore what sanction would be appropriate to punish the prosecution for claimed “deliberate and reckless use of false statements” in the warrant application, citing “People v Alfinito, 60 [sic] NY2d 181.” (534/ 000061-60.) The actual rule is somewhat more complex.
People v Alfinito (16 NY2d 181 [1965]) recognized the right of a defendant to inquire at a pretrial hearing to determine whether statements in an affidavit supporting the issuance of a search warrant were perjurious. Subsequent cases have expanded that right to include eavesdrop warrants. (See, People v McDonough, 51 Misc 2d 1065 [Nassau County Ct 1966]; People v Rizzo, 50 Misc 2d 458 [Nassau County Ct 1966].)
The right to a pretrial hearing, however, is not available for the mere asking. The defendant must make an initial showing in order to qualify for such a hearing. (People v Burch, 88 Misc 2d 835 [Sup Ct, Bronx County 1976].) Mere allegation of peijury is insufficient to trigger a hearing; rather, enough factual showing as to raise a bona fide issue of fact requiring a hearing to resolve must support the allegation. (People v Bavisotto, 179 *189 AD2d 1055 [4th Dept 1992]; People v Dunn, 155 AD2d 75 [4th Dept 1990].) The defendant’s motion must offer “sufficient proof demonstrating that the warrant affidavit was suspect” on a material point in order to garner a hearing. (People v Villanueva, 161 AD2d 552, 553 [1st Dept 1990].) Sufficient proof means “a substantial preliminary showing that a false statement was knowingly and intentionally included in the affidavit.” (People v Ingram, 79 AB2d 1088, 1088 [4th Dept 1981]; People v Panaro, 167 AD2d 951 [4th Dept 1990]; also see, People v Novick, 293 AD2d 692 [2d Dept 2002]; People v Armstrong, 267 AD2d 120 [1st Dept 1999].)
This language originated in the federal case that first expounded this right, Franks v Delaware (438 US 154 [1978]). There the United States Supreme Court held that a defendant is entitled to a pretrial hearing to explore the alleged falsity of information included in a warrant application when he makes a substantial preliminary showing that two conditions exist: (1) a false statement was knowingly and intentionally, or with reckless disregard for the truth, included by the affiant in a search warrant application, and (2) such false statement was necessary, or material, to the finding of probable cause leading to the issuance of the warrant.[10]
“To mandate an evidentiary hearing, the challenger’s attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.” (Franks, supra at 171.) The allegation of deliberate falsehood or of reckless disregard must point out specifically with supporting reasons the portion of the warrant affidavit that is claimed to be false. It also must be accompanied by an offer of proof, including affidavits or sworn or otherwise reliable statements of witnesses, or a satisfactory explanation of their absence. “Allegations of negligence or innocent mistake are insufficient.” (Franks, supra at 171-172; also cf., People v Christopher, 101 AD2d 504, 529 [4th Dept 1984], revd on other grounds 65 NY2d 417 [1985].)
It has been held that two sworn affidavits of fact by eyewitnesses who disputed material factual points contained in the warrant application were sufficient to meet this requirement of a “substantial preliminary showing.” (People v Seybold, 216 AD2d 935 [4th Dept 1995].) The presentation of “documentary evidence” has also been ruled sufficient. (People v Jacobson, 101 *190 Misc 2d 1069 [Sup Ct, Bronx County 1979].) An example of such documentary evidence is contradictory police reports regarding a material issue. (People v Burch, 88 Misc 2d 835, 836 [Sup Ct, Bronx County 1976].) Another example is contradictory pretrial sworn testimony on a material point. (People v Jacobson, 101 Misc 2d 1069, 1070 [Sup Ct, Bronx County 1979].)
Defendants have failed to make the necessary substantial preliminary showing that the warrants were issued based upon an affidavit containing knowingly, intentionally or recklessly false statements or omissions regarding material matters, much less that any allegedly false statement was necessary to the finding of probable cause. (See, People v Panaro, 167 AD2d 951 [4th Dept 1990]; People v Villanueva, 161 AD2d 552, 553 [1st Dept 1990]; People v Novick, 293 AD2d 692 [2d Dept 2002].)
The defendants have failed to support their allegation with sufficient proof demonstrating a substantial preliminary basis. Absent such a showing, they are not entitled to an evidentiary hearing. The defendants’ motion for a Franks/Alfinito hearing is consequently denied. (Cf., People v Kroll, 162 AD2d 717 [2d Dept 1990].)
C. Sealing Violations. The defense has requested that the eavesdrop warrants be controverted, the tapes suppressed and the indictment dismissed due to a claimed failure to properly seal the tapes. (534/000060.) The motion does not identify any specific claims of violation, but rather appears to posit a generic and conclusory contention that violations occurred. This, of course, is not surprising, since they have never been made privy to the procedures employed in this case.
Nothing submitted to this court to this point enables it to determine whether there was any failure to timely seal any of the wiretap tapes.
The prosecutor is hereby directed to file with this court an affidavit detailing when each tape was submitted to, and sealed by, the court. Such affidavit should further indicate whether and how such sealing was timely. The originals of all tapes should be delivered to this court. They will presumably contain obvious notations, in the nature of documentary evidence, clearly indicating when the tapes were originally delivered and sealed.
Copies of this affidavit are to be delivered to the defense attorneys. They will be afforded an opportunity to refile their motion on this ground, should their review of the facts disclosed *191 indicate a good-faith basis to do so. Any such resubmitted motion must contain detailed factual allegations grounding any contention that a sealing was untimely, as well as legal authority supporting that contention. The prosecutor will then be given reasonable time to respond to such motion. Should an evidentiary hearing prove necessary, it will be conducted at that time.
This court reserves decision upon this issue until such further motion is made. If no further motion is made, this request must be denied upon the showing thus far offered.
James/Evangelista Hearing:
The defense correctly indicates that a declaration by a coconspirator during the course of and in furtherance of the conspiracy is admissible against another coconspirator as an exception to the rule against hearsay. It is not even necessary, in order to make such proof competent, that the conspiracy be charged in the indictment. However, this evidence may be admitted only upon a showing that a prima facie case of conspiracy has been established, without recourse to the declaration sought to be introduced under the hearsay exception. (People v Salko, 47 NY2d 230, 237 [1979], rearg denied 47 NY2d 1010, 1012 [1979].)
While People v Evangelista (88 AD2d 804 [1st Dept 1982]) and People v Ardito (86 AD2d 144 [1st Dept 1982]) — cited by the defense — did hold that such a requested pretrial James[11] hearing was permissible; they did not mandate such hearings. *192 Indeed, this court could find no controlling New York authority ruling that a pretrial James/Evangelista hearing is mandatory.
This is a determination better left to the discretion of the trial judge. While there may be unusual situations where the best course of action would be to permit such a pretrial hearing (and the trial court would have the authority to do so), such a hearing in this case is ill-advised. To identify prospectively the anticipated hearsay declarations of alleged coconspirators, and to resolve in each instance the issue of admissibility, would require a substantial hearing duplicative of the trial itself. Such a procedure is a needless waste of court resources and the request masks the true intent of securing a new discovery tool and additional testimony for trial impeachment use.
Accordingly, this court denies the motion for a pretrial hearing on this matter, but does direct that the prosecutor refrain from any reference to the alleged details of any coconspiratorial statements during voir dire or opening statements to the trial jury. During voir dire, the prosecutor may simply inquire about the prospective jurors’ ability to apply the rules of law enunciated by the court, including the rule that any statement made by one conspirator, if made in furtherance of the conspiracy, is admissible evidence against every other coconspirator as if uttered by him directly. (Cf., People v L.B. Smith, Inc., 108 Misc 2d 261 [Sup Ct, Onondaga County 1981].)
Further, the prosecutor is directed to alert the court and opposing counsel, insofar as possible, that a witness will be asked to reveal such alleged coconspirator’s statement during his testimony. At that point, the court can make a ruling prior to the elicitation of such evidence before the trial jury. If necessary, the trial jury may be excused and an offer of proof taken out of the presence of the jury. This court may then review the evidence and rule upon the admissibility of the coconspirator’s statements before returning the trial jury.
Having read the grand jury minutes and reviewed the eavesdrop tapes submitted to that body, it is this court’s belief that the prosecution will have no difficulty proving a prima facie case of conspiracy with respect to any of these 21 named defendants. The more likely scenario will be the possibility of some concern that certain statements may not have been made *193 “in furtherance of the conspiracy.” That will have to await the trial offer of proof, should such a legitimate concern arise regarding the specific statements the prosecutor actually seeks to introduce.
Severance Motion:
When arrested, three defendants apparently made admissions to the police wherein they allegedly confessed to these crimes. They have filed a motion seeking to obtain a severance of their trials from the others, on the basis of a Bruton problem.
Defendant Ronald Graci implicated himself, Misteri and King. He also admitted to having a cocaine customer base of approximately 10 to 15 people.
Defendant Misteri implicated himself and Ronald Graci, but did not mention King or the other codefendants.
Defendant King implicated himself, but did not mention any of the other codefendants.
Defendants Kenneth Clark, Lynn Clark and Costanzo also made statements to the authorities (entitling them to Huntley hearings), but did not mention any of the other codefendants.
Defendants Ronald Graci, Misteri, King, Kenneth Clark, Lynn Clark and Costanzo are entitled to a Huntley hearing. The remaining defense attorneys may, of course, be present to observe such hearing should they so choose, but their clients are not entitled to participate in such hearing.
This court will reserve decision upon the motion to sever until all of the relevant facts are adduced at the Huntley hearing.
In order to alert all counsel to the court’s thinking on this subject, given the information currently known (in order to permit counsel to focus their thoughts, research and any argument on these areas), the following is what the court is considering.
Defendant Ronald Graci must have a separate jury from everyone else, except (possibly) Misteri. They allegedly admitted their own guilt and mentioned each other. They might be able to be tried together before the same jury.[12]
Defendant King can be tried together with the remaining 18 codefendants, since none of them mentioned any of the others *194 in their statements to police. King’s is simply a confession that implicates him and which will come into evidence only against him.
If these three trials (R Graci in one, Misteri in a second, and King and the other 18 in the third)[13] are tried separately, it is, of course, the prosecutor’s election as to which trial she desires to conduct first. Presumably, she will proceed with Graci first, Misteri second, and the remainder, last.
It seems, however, that a joint trial with three (or two) juries may be feasible. That way only one trial need be conducted. All of the evidence and all of the witnesses will be identical for each trial. The only difference is that when there is testimony regarding Ronald Graci’s statement to the police, or Misteri’s statement to the police, only their jury can be present to hear such information. The prosecutor (should she desire to mention such statements in her opening or voir dire) may need to conduct separate selections and openings for the three (two) juries. She will certainly have to conduct separate summations to the three (two) juries.
Counsel’s consideration of these matters is invited, so that they can assist this court in ultimately determining (after the Huntley hearings) whether such a contemplated joint trial is legally and practically feasible, and to aid in the creation of a process that will help to ensure the preservation of each defendant’s constitutional right to a fair trial.
The remaining contentions advanced by the defendants seeking dismissal of the indictment or suppression of evidence have been considered and found to be without merit.

. The same result might better have been achieved by expanding upon authority already existing at that time, which authority more directly addressed the perceived OCTF transgression in B.T. Prods. In Matter of Sussman v New York State Organized Crime Task Force (48 AD2d 154 [3d Dept 1975], affd 39 NY2d 227 [1976]), it was held that the OCTF must establish a factual basis justifying the issuance of a subpoena in the first instance by demonstrating that the records and documents sought bear a reasonable relationship to matters properly under OCTF’s investigatory jurisdiction, namely, “organized criminal activity.” “However broad the statutory language may be, the discretion must be exercised within bounds circumscribed by a reasonable relation to the subject-matter under investigation and to the public purpose to be achieved.” (Sussman v New York State Organized Crime Task Force, 39 *176 NY2d 227, 231 [1976].) “The resolution in each instance must be left to the sound determination of the court or Judge before which or whom the issue is raised, subject, of course, to appropriate appellate review. The proof must establish that the Deputy Attorney-General is proceeding in good faith and that the testimony and documents he seeks bear a reasonable relationship to matters properly under OCTF’s investigatory jurisdiction, namely, ‘organized crime activities’ which are also either multicounty or interstate.” (Sussman, supra at 233.) It would certainly have been an easier leap to extend this requirement to search warrants than to rewrite Executive Law § 70-a, as was done in B.T. Prods.

. The Court of Appeals itself has recognized the legislative abrogation of their ruling in B.T. Prods. See footnote in Della Pietra v State of New York (71 NY2d 792, 797 n [1988]), which reads: “Executive Law § 70-a was amended after the execution of the warrant and our decision in Matter of B. T. Prods, v Barr (44 NY2d 226). The law as it existed at the time the action arose applies to this case.”

. Cases cited before the passage of this amendment, relying upon B.T. Prods., are (like B.T. Prods.) no longer controlling on these issues.

. CPL 705.00 (1), (2).

. CPL 705.00 (1), (3).

. CPL 700.05 (1), (2), (5).

. Executive Law § 70-a (4); CPL art 690; 1.20 (34) (m).

. Particularly is this true where, as here, the telephone is routinely relied on to conduct the criminal enterprise under investigation and that fact is demonstrated to the issuing magistrate. (United States v Young, 822 F2d 1234, 1237 [2d Cir 1987].)

. Such has been ruled a valid consideration for the issuance of an eavesdrop warrant in People v Barber (269 AD2d 758, 759 [4th Dept 2000]).

. Such a requirement was imposed because it was felt that it “would suffice to prevent the misuse of a veracity hearing for purposes of discovery or obstruction.” (Franks, supra at 170.)

. (United States v James, 590 F2d 575 [5th Cir 1979], abrogation recognized in United States v Fragoso, 978 F2d 896 [5th Cir 1992], called into' doubt by United States v Perez, 823 F2d 854 [5th Cir 1987].) While the Fifth Circuit might require a pretrial hearing in these situations, the Second Circuit does not. In our Circuit, “the matter is admissible upon the trial court’s determination, made at the close of the government’s case, of the sufficiency of the evidence, independent of the hearsay testimony, that the alleged co-conspirator participated in the conspiracy.” (United States v Wilson, 565 F Supp 1416, 1437 [SD NY 1983]; see also United States v Wilson, 750 F2d 7 [2d Cir 1984], cert denied 479 US 839 [1986].) In this Circuit, the functional equivalent of what the Fifth Circuit calls a James hearing and requires before trial is provided by a Geaney ruling, which is provided only during trial, and relies for its basis on the facts adduced at trial, including evidence received subject to a motion to strike at the close of the government’s case. (United States v Geaney, 417 F2d 1116 [2d Cir 1969], cert denied 397 US 1028 [1970]; see also, United States v Margiotta, 688 F2d 108, 136-137 [2d Cir 1982], cert denied 461 US 913 [1983]; United States v Mastropieri, 685 F2d 776, 786-790 [2d Cir 1982], cert denied 459 US 945 [1982]; United States v Persico, 621 F Supp 842 [SD NY 1985], affd 774, F2d 30 [2d Cir 1985]; see, United States v Feola, 651 F Supp 1068, 1129-1130 [SD NY 1987], not followedon other grounds United *192 States v Falsetti, 721 F Supp 452 [WD NY 1988]; United States v Gotti, 784 F Supp 1017 [ED NY 1992]; also see, Bourjaily v United States, 483 US 171 [1987], rejected on other grounds People v Persico, 157 AD2d 339 [1st Dept 1990].)

. Although this does not appear possible to this court, since it is based upon the “interlocking confession” exception to the Bruton rule, which exception the United States Supreme Court has subsequently rejected. (See, Cruz v New York, 481 US 186 [1987]; Idaho v Wright, 497 US 805 [1990]; People v Eastman, 85 NY2d 265 [1995].)

. Or two trials (R. Graci and Misteri; King and the other 18 — if the interlocking confession exception is still viable).